**BMY, A DIVISION OF HARSCO CORP., Plaintiff,**

v.

**UNITED STATES of America, Defendant,**

and

**TRAK International, Inc., Defendant–Intervenor.**

**Civ. A. No. 88–536.**

United States District Court, District of Columbia.

Sept. 2, 1988.

1234

Lawrence M. Farrell, Lawrence J. O'Connell, and Marc E. Michels, McKenna, Conner & Cuneo, Washington, D.C.; Zane E. Finkelstein, Harsco Corp., York, Pa., of counsel, for plaintiff.

Robert C. Seldon, Asst. U.S. Atty., and, on brief, John D. Bates, Asst. U.S. Atty., and Jay B. Stephens, U.S. Atty., Washington, D.C., for defendant.

Stephen T. Owen and Timothy Trushel, Kominers, Fort & Schlefer, Washington, D.C., for defendant-intervenor.

CHARLES R. RICHEY, District Judge.

## INTRODUCTION

On January 29, 1988, the United States Army Tank Automotive Command ("TA-COM") concluded a two-year negotiated procurement process by awarding a contract for variable reach, rough terrain forklift trucks to TRAK International. In this suit, plaintiff, an unsuccessful bidder for that contract, charges that the contract award was unlawful. Plaintiff asks the Court to suspend performance of that contract and to enjoin defendant from acting on it. Plaintiff also asks the Court to declare either that plaintiff was entitled to the contract award or that defendant must cancel the contract award and reopen discussions with all offerors.

Plaintiff originally moved for a preliminary injunction. Pursuant to Fed.R.Civ.P. 65(a)(2), the parties agreed to combine the hearing on the preliminary injunction with the hearing on the merits of this suit. The Court has had the benefit of that hearing, the extensive legal and evidentiary materials submitted by the parties, and the parties' proposed findings of fact and conclusions of law. After carefully considering these submissions, the arguments advanced in Court, and the underlying law, the Court must conclude that plaintiff is not entitled to relief in this case, and it will enter judgment in favor of defendants and defendant-intervenors.[1]

## BACKGROUND

On October 29, 1985, the Army issued a Request for Proposal ("R.F.P.") for procurement of 6000–pound variable reach rough terrain forklift trucks. *Defendant's Exhibit 4.* That R.F.P. specified that the Army would pursue a two-phase procurement process in order to

... develop, test, and competitively procure a reasonably priced, state-of-the-art forklift, which has been comprehensively designed to meet the requirements of the performance specification, and to satisfy the considerations of reliability, availability, and maintainability (RAM), operator compatibility and vehicle productivity.

*Id.* at 1.

In Phase One, which was the subject of the October 29, 1985, R.F.P., the Army

---

1. This Opinion shall constitute the Court's findings of fact and conclusions of law in accordance with Fed.R.Civ.P. 52(a).

 In addition to plaintiff's central request for relief, plaintiff also moved to strike defendant's supplemental proposed finding of fact and the Second Declaration of Joel G. Wagner. Because the Court finds that plaintiff has suffered no prejudice from these submissions, and because they are helpful to the proper resolution of this case, the Court will deny both motions to strike.

would award contracts for design, development, and fabrication of prototype vehicles and ancillary equipment that would be extensively tested and evaluated by the Army. *Id.* at Section A. Phase One contract awards would be based on the Army's assessment of the apparent risks and benefits of the proposals; the apparent "technical" merit of the proposals would be the most important factor in the selection of Phase One contractors. *Id.* at L–16; M.

The October 29, 1985, R.F.P. also specified that Phase Two of the competition would be open only to successful bidders for the Phase One contracts. On April 18, 1986, plaintiff was awarded a Phase–One contract, as were both defendant-intervenor's predecessor-in-interest and Con Diesel Mobile Equipment.[2] *Spitzbarth Declaration* ¶ 6. On the basis of its submissions on paper, plaintiff's technical proposal was rated higher than those of the other Phase One contractors. *Phillips Affidavit* ¶ 6.

These paper submissions, however, were not relevant to the final analysis of the vehicles' technical merit. Rather, as the October 29 R.F.P. specified, in the second phase of the procurement the Army would select a production contractor

> ... based on the results of the Government's evaluation of 1) Phase-two Multi-Year production proposals; 2) Phase-one prototype vehicle test results; and 3) contractor proposed 'corrections' to vehicle deficiencies identified during prototype testing.

*Id.*

The Army conducted extensive testing of the prototype vehicles over a six-month period beginning in December, 1986. *Defendant's Exhibit 3*, part IV, at 1. The Army kept the contractors informed of test results in several ways. The Army issued "Test Incident Reports," which described the prototypes' shortcomings in the reliability and productivity tests. The Army also released the performance test results,

which revealed the extent to which the prototypes met or failed to meet the contract specifications. *Id.* In addition to these reports, the Army also notified contractors of vehicle part failures through formal and informal correspondence. *Wagner Declaration,* ¶ 8.

These tests revealed that, despite plaintiff's technical superiority on paper, plaintiff's prototype vehicles were seriously flawed. "Several structural failures occurred in the frame, along with numerous electrical failures and hydraulic leak problems." *Defendant's Exhibit 3, Part IV,* at 13. Moreover, plaintiff's vehicles failed to comply with gradeability and braking requirements. *Id.* All told, plaintiff's prototypes failed to meet twenty-eight specification requirements, *id.,* and experienced seventy-one different types of failures, *id.* at 17, scattered throughout the vehicle, *Defendant's Exhibit 2,* at 2. As might be expected in a vehicle with so many critical failure "modes," plaintiff's trucks had a mean time between unscheduled maintenance actions of 9.3 hours. *Defendant's Exhibit 3,* at 17.

In contrast, defendant-intervenor's prototype vehicles failed to meet twenty-one specification requirements, *id.* at 3, and had forty-seven different types of failures, *id.* at 5. These raw figures, however, do not reflect the fact that most of these failures were located in one section of the prototype; because the problems were centralized, the Army found, they could be corrected more successfully. *Defendant's Exhibit 2,* at 2. The Army also found that, while the mean time between failures of the TRAK prototype was only 6.5 hours during the early portion of the testing period, the TRAK prototypes' performance and time between failures were "superior" once a design correction was made. *Defendant's Exhibit 2,* at 5.

On June 12, 1987, the Army released the Phase Two Request for Proposal. *Defendant's Exhibit 5.* This R.F.P. called for bids

---

**2.** Defendant-intervenor TRAK International, Inc., is the successor-in-interest to the original bidder, the Koehring Construction Equipment Division of AMCA International. *Defendant's*

*Exhibit 1,* at 2. The other Phase I contractor, Con Diesel Mobile Equipment, was purchased by Eagle–Picher Industries on October 27, 1987. *Id.*

on production and delivery of 1,801 fork-lifts over a four-year period, with options for production of additional vehicles. The R.F.P. clearly stated that:

> [t]he objective of this acquisition is the award of a Multi-year production contract to that contractor whose combination of Phase-one prototype test results and Phase-two Multi-year proposal ... have been evaluated and found most advantageous to the Government.

*Id.* at 1. The R.F.P. went on to state that the Source Selection Authority would evaluate the proposals on the basis of cost, technical, Logistics/MANPRINT,[3] and production capability. *Id.* at M–2. Of those factors, the R.F.P. stated, cost "is of primary importance and is worth ... somewhat more" than all other factors combined. *Id.*

The R.F.P. also specified the factors that would be used to evaluate the offers. "Cost" would be evaluated in terms of "price reasonableness," which in turn would be evaluated on the basis of several subcriteria. *Id.* at M–3, M–6–7. The Army also listed a number of criteria by which to judge Logistics/MANPRINT and production capability, and it stated that it would simply determine whether the proposals were acceptable or unacceptable with respect to these two factors.

The criteria by which the Army would analyze the technical merits of each proposal were a bit more complicated. The Army would evaluate both the results of its extensive testing of the prototype vehicles and the offerors' proposed changes to correct flaws revealed by that testing. *Id.* at M–01(d), M04.B. The Army would not assume that proposed corrections would solve the problems; instead, it developed seven criteria for analyzing the risk associated with the changes. *Wagner Declaration,* at ¶ 10. The R.F.P. specified that the

Army would analyze this technical information with an eye toward "specification compliance," "reliability," "productivity," "maintainability," and "availability." *Id.* at M–3.

On August 10, 1987, the Army received Phase Two proposals from the three participants in the Phase One testing, BMY, Koehring (now TRAK International), and Con Diesel (now Eagle Picher Industries). These were submitted to Proposal Evaluation Boards ("Boards") whose members were chosen by the Source Selection Authority for their expertise in areas related to the contract. *Spitzbarth Declaration,* ¶ 12. The Boards evaluated the proposals in accordance with factors detailed in the Source Selection Plan, a previously adopted comprehensive set of criteria that provided, *inter alia,* for notifying an offeror of all "deficiencies" in its proposal as well as any need to clarify or substantiate any part of the proposal. *Defendant's Exhibit 3,* at Parts II, VII.

From August, 1987, through December, 1987, these Boards conducted comprehensive discussions about the technical deficiencies in plaintiff's proposal.[4] *Defendant's Exhibit 7.* The Boards also quizzed plaintiff on several other aspects of its submission. *Id.* On December 3, 1987, the Army issued a request for Best and Final Offers, which the offerors submitted on December 11, 1987. *Spitzbarth Declaration,* ¶ 13. The Boards then completed their report, which was forwarded to the Source Selection Authority ("S.S.A.") for this contract, Brigadier General Carl W. Tipton, TACOM's Deputy Commanding General for Procurement and Readiness.

General Tipton asked the Boards to clarify certain aspects of the reports. Among these were the corrective actions proposed by both plaintiff and defendant-intervenor,

---

3. "Logistics/MANPRINT" appears to be Army shorthand for a variety of explanatory materials. In this context, "Logistics" refers to technical manuals and other explanations of requirements, while "MANPRINT" refers to "human engineering" factors (or, as the Court believes could be expressed in plain English, information designed to make it easier for people to

operate the machines). *See Defendant's Exhibit 5,* at § L.

4. The Court assumes that the discussions with the other offerors were equally comprehensive, but the evidence in the record deals only with the discussions between plaintiff and the Proposal Evaluation Board.

the "reliability growth"[5] and likely contract performance of both plaintiff and defendant-intervenor, and plaintiff's past performance and MANPRINT. *Defendant's Exhibit 11.* The Boards issued this report on January 15, 1988. *Defendant's Exhibit 2.*

The reports documented significant problems with plaintiff's proposal. In addition to plaintiff's "unacceptable" Logistics/MANPRINT and production capabilities, plaintiff's proposal was plagued with technical problems. In contrast to TRAK's prototype, which had a predictable, recurring flaw, plaintiff's prototype exhibited random, new "failure modes" throughout the testing period. *Defendant's Exhibit 2,* at 1. Indeed, the Army found that plaintiff's prototype had so many different and widely dispersed failures that plaintiff had to "redesign" part of the vehicle and substantially "fix" most of the vehicle, all with methods untested during the Phase One prototype testing. *Id.* at 4–5. Thus, the Army concluded, plaintiff's many changes rendered the prototype testing irrelevant to any consideration of how well or poorly plaintiff's final vehicle would work. *Id.* at 4; *Defendant's Exhibit 1* at 4.

Plaintiff's offer was, however, approximately 10 percent cheaper than the other submissions. Nonetheless, the S.S.A. found that the lower initial cost of plaintiff's trucks was "outweighed by the superiority of the TRAK proposal," which he found "most advantageous to the Army" because it "offers the Government the greatest value for the dollars expended." *Defendant's Exhibit 1,* at 3, 6, 7. Accordingly, he selected TRAK International for award of the multi-year contract at issue, and plaintiff filed this suit challenging the contract award.

## THE COURT MUST GIVE GREAT DEFERENCE TO THE GOVERNMENT'S DECISION.

A frustrated bidder for a government contract clearly has standing to seek judicial review of the legality of the contract award. *See, e.g., National Maritime Union v. Commander, Military Sealift Command,* 824 F.2d 1228, 1237–38 (D.C.Cir. 1987); *Gull Airborne Instruments, Inc. v. Weinberger,* 694 F.2d 838, 841 (D.C.Cir. 1982); *Scanwell Laboratories v. Shaffer,* 424 F.2d 859 (D.C.Cir.1970). The role of the Court, however, is more circumscribed than in many other types of actions.

Most important, the Court may not substitute its own view of how a procurement should be conducted for that of the experienced contracting officer. As the Court of Appeals for this Circuit has noted, "[j]udges are 'ill-equipped to settle the delicate questions involved in procurement decisions, where long and complex factual histories, subtle economic factors, and the need for expeditious buying decisions require assessments 'better left to the expertise of an executive agency.' '" *Delta Data Systems Corp. v. Webster,* 744 F.2d 197, 203 (D.C.Cir.1984) (*quoting Kinnett Dairies, Inc. v. Farrow,* 580 F.2d 1260, 1271 (5th Cir.1978) (citation omitted). Accordingly, the Court must afford great discretion to officials in the contracting agency, and must not " 'improperly intrude into the agency's decisionmaking process.' " *Delta Data Systems Corp. v. Webster,* 744 F.2d at 203 (*quoting Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council,* 435 U.S. 519, 525, 98 S.Ct. 1197, 1202, 55 L.Ed.2d 460 (1978).

Thus, in a challenge to a procurement decision, a disappointed bidder must " . . . bear a heavy burden of showing either that (1) the procurement official's decisions on matters committed primarily to his own discretion had no rational basis, or (2) the procurement procedure involved a clear and prejudicial violation of applicable statutes or regulations." *Kentron Hawaii Ltd. v. Warner,* 480 F.2d 1166 (D.C.Cir. 1973). As long as the procurement and the contract award meet these tests, "the court should stay its hand even though it might, as an original proposition, have reached a

---

**5.** "Reliability growth" is a shorthand term for the expected increase in performance without need for unscheduled maintenance as well as for the expected increase in time between actual vehicle failures. *See Defendant's Exhibit 3,* part IV, at 6.

different conclusion as to the proper administration and application of the procurement regulations." *M. Steinthal & Co. v. Seamans,* 455 F.2d 1289, 1301 (D.C.Cir. 1971).

Plaintiff claims that the procurement fails both of these tests, and it has advanced a host of rationales to support its view. After carefully considering the evidence, however, the Court must conclude that plaintiff has failed to carry its "heavy burden." [6]

## THE SOURCE SELECTION AUTHORITY'S DECISION TO AWARD THE CONTRACT TO DEFENDANT–INTERVENORS DID NOT INVOLVE A CLEAR AND PREJUDICIAL VIOLATION OF APPLICABLE STATUTES OR REGULATIONS.

A. Defendant conducted "meaningful discussions" with plaintiff.

Plaintiff first asserts that defendant violated the Competition in Contracting Act, 10 U.S.C. § 2301 *et seq.,* and the regulations promulgated thereunder by failing to conduct "meaningful discussions" about the shortcomings of plaintiff's proposal. The focus of plaintiff's argument is defendant's alleged failure to inform plaintiff of all perceived technical inadequacies in plaintiff's trucks as well as the problems with its production capability and "Logistics/MANPRINT" submission. The Court finds that, although plaintiff has shown that the discussions were not exhaustive, plaintiff has not proved that defendants failed to conduct "meaningful discussions" within the meaning of that term.

Prior to the request for "Best and Final Offers," the offerors for this procurement dealt with a contracting officer who was required to conduct "negotiations concerning cost or price, technical requirements, and other terms and conditions." 48 C.F.R. § 15.604(c)(3). As part of these negotia-

tions, he had to "conduct written or oral discussions with all responsible sources who submit proposals within the competitive range." 10 U.S.C. § 2305(b)(4)(B). These discussions are defined by regulation as

... any oral or written communication between the Government and an offeror (other than communications conducted for the purpose of minor clarification), whether or not initiated by the Government, that (a) involves information essential for determining the acceptability of a proposal, or (b) provides the offeror an opportunity to revise or modify its proposal.

48 C.F.R. § 15.601 (1987).

While "[t]he content and extent of the discussions is a matter of the contracting officer's judgment, based on the particular facts of each acquisition," *id.* at § 15.610(b), they must include certain elements. Specifically, the contracting officer must "[a]dvise the offeror of deficiencies in its proposal so that the offeror is given an opportunity to satisfy the Government's requirements." *Id.* at § 15.610(c)(2).

This is not, however, a mandate to reveal every imperfection in the proposal. The Federal Acquisition Regulations ("F.A.R.") define "deficiencies" as "any part of a proposal that fails to satisfy the Government's requirements." *Id.* at § 15.601. Thus, the contracting officer had to inform plaintiff of any failures to meet the specifications of the procurement, not of all technical flaws discovered in its vehicles.

This conclusion is buttressed by the F.A.R.'s prohibition of discussions about certain technical shortcomings in the proposals. The contracting officer involved in this procurement, like all contracting officers, was specifically prohibited from engaging in

(1) Technical leveling (i.e., helping an offeror to bring its proposal up to the level of other proposals through successive

---

**6.** As noted above, in *Kentron Hawaii,* the Court first investigated the "rationality" of the contract award and then examined whether the procurement violated applicable laws or regulations. 480 F.2d at 1169. This Court will proceed in reverse order, however, since the ration-

ality of agency action is relevant only if the agency did not violate applicable statutes or regulations. *See, e.g., Delta Data Systems v. Webster,* 744 F.2d 197, 204 (D.C.Cir.1984); *Abel Converting, Inc. v. United States,* 679 F.Supp. 1133, 1139 (D.D.C.1988).

rounds of discussion, such as by pointing out weaknesses resulting from the offeror's lack of diligence, competence, or inventiveness in preparing the proposal); [and]

(2) Technical transfusion (i.e., Government disclosure of technical information pertaining to a proposal that results in improvement of a competing proposal).

*Id.* at § 15.610(d).

 Thus, the regulations set the parameters of the "discussions" to be held by a contracting officer. Where a proposal meets the procurement's specifications, and is in the competitive range, the contracting officer has discretion to conduct discussions as he or she sees fit, but he or she may not identify technical weaknesses if doing so would put an offeror in a better competitive position than it would otherwise have enjoyed. *See, e.g., Saco Defense System Division v. Weinberger,* 806 F.2d 308, 312–13 (1st Cir.1986); *Price Waterhouse,* 65 Comp.Gen. 205, 209 (1986); *Ford Aerospace and Communications Corp.,* 80–2 CPD ¶ 439 at 22 (1980).

Plaintiff does not claim that the Contracting Officer failed to discuss any inability to meet the technical specifications of the R.F.P.; rather, plaintiff argues that the procurement was unlawful because the contracting officer did not alert plaintiff to the many technical problems perceived in its submission. Since defendant advised plaintiff of technical difficulties with its prototype through "test incident reports," formal and informal briefings, and two formal written submissions, *see Defendant's Exhibit 7; Spitzbarth Declaration* at ¶ 8–9 (contractors informed of test results on "almost a daily basis"), *Wagner Declaration* at ¶ 8, plaintiff's claims ring somewhat hollow. Indeed, it appears that the contracting officer exercised his discretion to keep the offerors very well informed.

 More important, it is apparent that what plaintiff wanted was identification of the technical weaknesses that resulted in its comparatively unfavorable technical rating. This is precisely the "technical leveling" or "technical transfusion" forbidden

by the regulations. As should be obvious, the contracting officer's failure to violate regulations cannot be grounds for setting aside a procurement award.

Once the contracting officer requests "Best and Final Offers" from the offerors, a different stage of the procurement process begins. After that point, he

> should not reopen discussions unless it is clearly in the Government's interest to do so (e.g., it is clear that information available at that time is inadequate to reasonably justify contractor selection and award based on the best and final offers received).

48 C.F.R. § 15.611(c).

 The contracting officer requested Best and Final Offers on December 3, 1987. *Spitzbarth Declaration,* ¶ 13. Thereafter, he had no obligation to reopen discussions with plaintiff unless, in his judgment, additional discussions would have been "clearly" in the government's best interest. *See, e.g., RCA Service Co.,* 80–1 CPD ¶ 407 (1980). Although additional discussions might well have benefitted plaintiff, the contracting officer did not violate the applicable law or regulations by finding that such discussions would not benefit the government. The Court cannot fault him for failing to conduct them.

 As mentioned above, plaintiff also alleges that defendant violated the "meaningful discussions" requirement by failing to discuss plaintiff's purportedly poor performance on other government contracts. This is not true. The Phase Two R.F.P. stated that offerors were to "provide a synopsis of deliveries versus schedule on prior Government contracts." *Defendant's Exhibit 5,* at L–28. The contracting officer found plaintiff's response to this requirement inadequate and, in a "Notice of Deficiency," specifically asked plaintiff to provide this information. *Defendant's Exhibit 7,* at Attachment D. Accordingly, plaintiff was fully notified of the importance of this information and was given an opportunity to supplement its submission however

it saw fit.[7]

 Moreover, even if defendant had failed to afford plaintiff an adequate opportunity to rebut inferences about plaintiff's ability to perform the contract, that failure would not be reason to set the contract award aside. The S.S.A. was principally concerned with the technical inadequacies of plaintiff's proposal. *Defendant's Exhibit 1.* While he feared that an award to plaintiff would "seriously jeopardize" the timely completion of the contract, *id.* at 6, this was only one of several concerns about plaintiff's production capacity. *Id.* Indeed, it is clear to the Court that, even if the S.S.A. was fully satisfied that plaintiff could deliver its vehicles on time, plaintiff would not have been awarded this contract. *See id.* Accordingly, the Court cannot find that plaintiff suffered any prejudice from any possible inadequacy in defendant's discussions about plaintiff's prior contract performance. *See, e.g., CACI Field Services, Inc. v. United States,* 854 F.2d 464 (Fed.Cir.1988) (per curiam).

B. Plaintiff has not proved that it was constructively debarred.

Plaintiff also argues that, by grounding its decision in part on plaintiff's poor performance record, and by failing to afford plaintiff an opportunity to refute the allegations of poor past performance, the S.S.A. effectively suspended or debarred plaintiff without due process of law. Plaintiff has misconstrued both the meaning of "suspension" and "debarment" and the actual effect of its performance record on this contract award.

 A contractor is "suspended" when it is temporarily disqualified from participating in any government contracts or subcontracts. 48 C.F.R. § 9.403 (1987). A contractor is "debarred" when it is excluded from participating in government contracts or subcontracts "for a reasonable, specified period." *Id.* Such actions occur when the government formally or constructively precludes a contractor from participating in future government contracts or when a contracting official's decisions effectively prevent a contractor from participating in that and future procurements. *See, e.g., Art–Metal–USA v. Solomon,* 473 F.Supp. 1 (D.D.C.1978).

 A suspension or debarment, be it formal or constructive, is legal only if the contractor has been afforded full due process protections. *See, e.g., Old Dominion Dairy Products, Inc. v. Secretary of Defense,* 631 F.2d 953 (D.C.Cir.1980); *Peter Kiewit Sons' Co. v. United States Army Corps of Engineers,* 534 F.Supp. 1139, 1153 (D.D.C.1982), *rev'd on other grounds,* 714 F.2d 163 (D.C.Cir.1983). On the basis of this record, the Court finds that defendant need not have afforded such protections to plaintiff because there is no evidence at all that plaintiff was formally or constructively blacklisted from government contracts.

All offerors for this large procurement were told that the S.S.A. would examine their performance history under other government contracts. *Defendant's Exhibit 1,* at 6; *Defendant's Exhibit 2,* at 14. Because some of plaintiff's current government contracts were delinquent, *id.,* the S.S.A. questioned whether plaintiff's other obligations would dilute management attention and hinder performance of the contract award at issue; the S.S.A. was concerned enough about this prospect to rank plaintiff's proposal below TRAK's proposal on one segment of the "production capability" criteria. *Defendant's Exhibit 1,* at 6.

The use made of plaintiff's contracting history, of which plaintiff had full warning,

---

7. Plaintiff also attacks the government's conduct in response to this second request for information about plaintiff's performance history. Because the Source Selection Authority, in his experienced judgment, found plaintiff's second submission of information about its performance history inadequate (and it seems that plaintiff omitted all reference to contracts on which it was delinquent), he asked the government to supplement that information with information from TACOM project managers. The government violates no law by seeking relevant information from persons within the agency, especially when it first sought that information from plaintiff itself. *See, e.g., CACI Field Services, Inc. v. United States,* 13 Cl.Ct. 718, 729 (1987), *aff'd,* 854 F.2d 464 (Fed.Cir.1988).

cannot legitimately be construed as a ban on participation in this or future procurements. The Court finds that defendant did not violate applicable law or regulations by its treatment of plaintiff's past contract performance.

C. Plaintiff has not proved that defendant failed to abide by the criteria established in the Requests for Proposals.

In a negotiated procurement such as the one at issue, the proposals must be evaluated "solely on the factors specified in the solicitation." 10 U.S.C. § 2305(b)(1). Plaintiff maintains that defendant failed to abide by the criteria stated in the R.F.P., but, again, plaintiff is mistaken.

■■■ As noted above, the Phase Two R.F.P. stated that each proposal would be evaluated in terms of "cost," "technical," "Logistics/MANPRINT," and "production capability" merit; of these factors, "cost [was] of primary importance and is worth significantly more than Technical, and somewhat more than Technical, Logistics/MANPRINT and Production Capability combined." *Defendant's Exhibit 5, at M–2.* Because of the greater worth of the "cost" criterion, plaintiff contends that its inadequacies in the other categories are irrelevant and that it should have been awarded the contract simply because its trucks carried the lowest initial price tag.

This amounts to a contention that no criterion but cost had significance in the procurement decision; taken to extremes, it suggests that, despite the time and expense devoted to testing prototype vehicles in Phase One of this procurement, defendant would have to award the contract to an offeror whose trucks did not function but cost only $1. This obviously makes no sense. Nor would it comply with the R.F.P.: the R.F.P. did not make all criteria save cost irrelevant. Rather, it promised a contract award to that offeror whose proposal "is most advantageous to the Government and offers the greatest value based on the evaluation and award criteria...." *Id.* at M–1.

Defendant did not devote seven months to prototype testing merely to fritter away the federal fisc. As the S.S.A. was charged with identifying the proposal that offered the greatest "value" to the government, he had discretion to find that plaintiff's somewhat lower price tag did not offer a better value than a competing proposal for a significantly better vehicle at a slightly higher initial price. *Id.; see also, e.g., Frequency Engineering Laboratories,* 87–1 CPD ¶ 392, at 6 (1987). In light of the government's responsibility to protect the public interest by obtaining low cost, high quality items, and the R.F.P.'s failure to say that cost would be the sole factor on which the contract award would turn, the Court will not give the R.F.P. the constricted interpretation urged by the plaintiff.

■■■ Moreover, even if cost were the only factor on which the contract award turned, plaintiff would still not prevail. The R.F.P. stated that "[c]ost, while evaluated in terms of the reasonableness of the proposal, may further be considered in terms of overall program costs and affordability." *Defendant's Exhibit 5,* at M–1. Thus, plaintiff, like its competitors, was on notice that defendant would examine not merely the initial price tag of the vehicles but their lifetime cost. As the Boards found that plaintiff's vehicles had a *higher* prospective lifetime cost than that of the vehicles produced by the winning bidder, *see Defendant's Exhibit 2,* at 2–3, the S.S.A. had discretion to find that plaintiff's proposal did not carry the lowest "cost" of the competing proposals for this contract.

■■■ Plaintiff's response to these facts is that, because the mean time between its vehicles' failures was superior to that of defendant-intervenors', the Army should have found plaintiff's lifetime cost lower and should have found plaintiff's proposal technically acceptable enough to merit the contract award. Once again, the Court cannot accept plaintiff's argument.

For one, the Boards and the S.S.A. both found that plaintiff's "mean time between failures" and mean time between unscheduled maintenance actions were not necessarily better than those of defendant-inter-

venors. Rather, the Board found that TRAK's higher failure rate was the direct result of TRAK's decision to continue testing on its vehicles during redesign of a broken steering knuckle. *Defendant's Exhibit 3*, at 5. Accordingly, the Board found,

> ... the reliability number based on raw data ... [was] driven down, and the resultant [Mean Time Between Unscheduled Maintenance Actions] is not reflective of the reliability which could have been demonstrated during prototype testing if [TRAK] had been allowed to fix the problem before continuing testing.

*Id.*

Moreover, the Board studied whether vehicle reliability would increase after the offerors corrected the problems revealed by prototype testing. The Board projected that the ultimate mean time between unscheduled maintenance actions of TRAK's vehicles would be between 17.89 and 26.7 hours, while that of plaintiff's vehicle would be at most 11.89 hours. *Id.* at 7, 20. Accordingly, plaintiff errs by claiming that the Board found that the mean time between failures of its vehicles was superior to that of TRAK's vehicles.

Plaintiff alleges that defendant deviated from the stated criteria in another way as well. Specifically, plaintiff claims that it could have lost the contract award "only if the Army misapplied the stated evaluation criteria" for the technical evaluation of the proposals. *Memorandum of Points and Authorities in Support of Plaintiff BMY's Motion for a Preliminary Injunction*, at 27.

Although plaintiff's argument is unclear, it seems to center on a contention that defendant ignored technical information favorable to plaintiff. Plaintiff suggests that, because the only "factual objective technical deficiency" of which it was advised in a post-award debriefing was the projected rate for the mean time between failures plaintiff's production equipment, defendant found no other serious technical problems in plaintiff's proposal. *Id.* at 25–26. Plaintiff apparently believes that the R.F.P. does not permit denying it the con-

tract on the basis of this shortcoming. Once again, plaintiff has misapprehended the S.S.A.'s analysis.

What the Boards and the S.S.A. found was that the technical problems with plaintiff's vehicles were serious enough to outweigh the advantages of the vehicles' apparently lower cost. *Defendant's Exhibit 3*, at 13–25; *Defendant's Exhibit 1*, at 3–5. This decision was not based solely on the failure rate of plaintiff's trucks. Rather, they extensively analyzed, and made findings concerning, the degree to which all offerors' vehicles met the standards established under all five technical sub-criteria. *See Defendant's Exhibit 3*, at Parts IV and X. This is precisely what the R.F.P. required. *Defendant's Exhibit 5*.

This analysis revealed far more risk in plaintiff's proposal than plaintiff admits. Quite in contrast to plaintiff's assertion that the only technical problem identified by the Board was the mean time between unscheduled maintenance actions, the Board detailed problems with and disadvantages of plaintiff's vehicles under every one of the sub-criteria. *Id.* at 13–25. As the Source Selection Board summarized:

> The test results [on BMY's prototype production vehicle] indicated that the prototype vehicles would require extensive redesign to withstand the military usage and environment. Several structural failures occurred in the frame, along with numerous electrical failures and hydraulic leak problems. Additionally, failure to comply with gradeability and braking requirements necessitated a change in the engine and front axle. The proposed changes assessed by the technical team were significant enough and extensive enough to the point that test results achieved during the Government's prototype tests have been essentially invalidated by the extent of redesign, and would therefore present a technical risk similar to that which was present at the start of prototype testing.

*Defendant's Exhibit 3*, at 13.

In sum, on the basis of this record, plaintiff has not carried its burden of showing that defendant clearly failed to abide by

the stated criteria governing this procurement. Indeed, from the evidence in this record, plaintiff's charge must be deemed utterly baseless.

D. Plaintiff has not shown that defendant based the contract award on unauthorized methodology.

Plaintiff argues that defendant's methodology for projecting the mean time between unscheduled maintenance actions of corrected vehicles was unlawful for two reasons. First, plaintiff maintains that the methodology was in essence an evaluation factor that was undisclosed and therefore unlawful. Alternatively, plaintiff argues that the methodology amounted to a government policy that was never promulgated or officially adopted and therefore one whose use violates the Administrative Procedures Act. Neither argument is convincing.

■ Plaintiff correctly states that all "evaluation factors" must be disclosed in the Request for Proposals, and that the government may employ only those "evaluation factors" listed in the R.F.P. 48 C.F. R. §§ 15.605(e), 15.608(a). But an R.F.P. need not explicitly identify the method by which the government will evaluate that factor. As long as an unidentified method is logically and reasonably related to the stated evaluation factors, the government may use it. *See, e.g., Washington Occupational Health Associates, Inc.,* 86–1 CPD ¶ 567; *Fort Wainwright Developers, Inc.,* 86–1 CPD ¶ 459, *aff'd on reconsideration sub nom. Fairbanks Associates,* 86–2 CPD ¶ 162.

■ In the Phase Two R.F.P., defendant plainly stated that it would perform a "risk analysis" of any "corrections" on the prototype vehicles and would perform this risk analysis for all evaluation factors in the "technical" area of the proposal analysis. *Defendant's Exhibit 5,* at M–4. Thus, defendant informed all offerors that it would analyze the effect of corrections on all aspects of vehicle performance. As long as its method of analysis was logically and reasonably related to the factors set forth in the R.F.P. (i.e., specification compliance, reliability, productivity, maintainability, and availability), defendant did not err by using an undisclosed method of risk analysis.

The undisclosed method employed by defendant is detailed in Army Materiel Systems Analysis Activity ("AMSAA") Technical Report No. 357. This method projects reliability growth on the basis of observed failures after a prototype vehicle was corrected, raw test data, the types of failures, and the number of failures. *Defendant's Exhibit 9; Plaintiff's Trial Exhibit 1.* Such a method is logically and reasonably related to the identified "reliability" factor, as it projects future reliability from currently available information. Accordingly, the Court finds that defendant did not have to disclose this method in the R.F.P.

■ Plaintiff's other ground for challenging defendant's use of AMSAA Technical Report No. 357 is that the Report was never officially adopted as government policy and its use therefore violates the Administrative Procedures Act. Here, too, plaintiff is mistaken.

The Administrative Procedures Act requires notice, comment, and advance publication of "substantive rules of general applicability adopted as authorized by law;" it also requires notice or publication of (but not public comment on) "statements of general policy or interpretations of general applicability formulated and adopted by the agency." 5 U.S.C. § 552(a)(1)(D) (1987). AMSAA Technical Report No. 357 fits neither of these categories.

A "substantive" rule "establishes a standard of conduct which has the force of law...." *Pacific Gas & Electric Co. v. Federal Power Commission,* 506 F.2d 33, 38 (D.C.Cir.1974). The hallmark of such a rule is that it does not " 'leave [ ] the agency and its decisionmakers free to exercise discretion ...,' *McLouth Steel Products Corp. v. Thomas,* 838 F.2d 1317, 1320 (D.C. Cir.1988) (*quoting Community Nutrition Institute v. Young,* 818 F.2d 943, 946 (D.C. Cir.1987), [and] thereby ha[s] a binding effect or impos[es] rights and obligations." *Vietnam Veterans v. Secretary of the*

*Navy*, 843 F.2d 528, 536 (D.C.Cir.1988), *see also, e.g., Chrysler Corp. v. Brown*, 441 U.S. 281, 302, 99 S.Ct. 1705, 1718, 60 L.Ed. 2d 208 (1979) (*quoting Morton v. Ruiz*, 415 U.S. 199, 232, 94 S.Ct. 1055, 1073, 39 L.Ed. 2d 270 (1974).

AMSAA Technical Report 357 is not such a rule. Defendant was not obligated to use it, or any other method, in its assessment of the Reliability subcriterion of the R.F.P. Moreover, the Boards and the S.S.A. were free to give the analysis under the AMSAA methodology as much—or as little—weight as they thought proper, and they in fact used those test results only in conjunction with other testing methods. *See Second Wagner Declaration*, ¶ 3. Accordingly, the Court finds that the AMSAA Technical Report 357 is not a "substantive rule" and was not subject to the notice and comment provisions of the Administrative Procedures Act that govern substantive rules.[8]

Nor is AMSAA Technical Report 357 a "statement of policy or interpretation[ ] of general applicability formulated and adopted by the agency." 5 U.S.C. § 552(a)(1)(D). It is not a statement of future effect that allows agency officials discretion with respect to their current conduct. *See, e.g., McLouth Steel Products Corp. v. Thomas*, 838 F.2d at 1320; *Community Nutrition Institute v. Young*, 818 F.2d at 948. Rather, it describes a mathematical formula that the agency chose to employ in this particular case and need never employ again. As such, the notice or publication provisions governing statements of policy are inapplicable to the AMSAA Report.[9]

**E. Plaintiff has not proved that defendant erred by failing to rank the offerors' proposals according to a point score.**

██ Finally, plaintiff implies that the procurement was unlawful because the Boards and the S.S.A. did not adopt a numerical scoring system for their analyses of the procurement and thus did not have an objective guide for determining the worth of the competing proposals. The Boards and the SSA were under no such obligation.

The government is not required by regulation to analyze contract offers by a numerical scoring or weighting system. Rather, numerical weights "*may* be employed" as part of the government's evaluation of contract proposals. 48 C.F.R. § 15.605(e) (emphasis added). Nor did the R.F.P. obligate defendant to use a numerical weighting system; rather, it clearly stated the factors, but not the evaluation technique, that would determine the winning proposal. *Defendant's Exhibit 5.* Moreover, even if defendant *had* assigned numerical weights to the factors it considered, it had discretion to treat the resulting "score" as a guide, and not as the determinant of the contract award. *See, e.g., Grey Advertising, Inc.*, 55 Comp.Gen. 1111, 1118 (1976).

---

8. Plaintiff's argument relies heavily on *NI Industries, Inc. v. United States*, 841 F.2d 1104 (Fed. Cir.1988). In that case, the Federal Circuit was concerned with an internal agency rule that provided a monetary reward to the party who first submitted written notice of a design improvement. Although the plaintiff had developed the improvement, he did not submit the first written notice of the advance. The parties in *NI Industries* stipulated that, but for the internal rule, the plaintiff would have received the monetary reward. *Id.* at 1108. As such, the Court found, the agency's rule affected individual rights and interests and therefore was a substantive rule that was invalid absent notice, comment, and advance publication. *NI Industries* has no bearing on the validity of defendant's use of AMSAA Report 357, as defendant had discretion to use the Report and discretion to ignore the results obtained under it.

9. Defendant argues that the AMSAA Report is exempt from the APA's publication provisions because it "relate[s] solely to the internal personnel rules and practices of [the] agency." 5 U.S.C. § 552b(c)(2). But this language creates an exception to the Freedom of Information Act, not the publication requirement, and it is not clear that the Report would be exempt from the FOIA. *See Crooker v. Bureau of Alcohol, Tobacco and Firearms*, 670 F.2d 1051, 1071 (D.C. Cir.1981) (en banc) (Exemption applies when documents are used for "predominantly internal purposes" and when disclosure would "significantly risk circumvention of federal statutes or regulations"). Nonetheless, the principle is instructive: if documents used for internal agency purposes may be exempted from public disclosure, they may also be exempted from a publication requirement.

In sum, plaintiff has advanced a host of arguments but has not proved that any aspect of the procurement clearly and prejudicially violated applicable laws or regulations. As such, plaintiff may obtain relief only if it has shown that the decision to award the contract to defendant-intervenor had no rational basis.

PLAINTIFF HAS NOT CARRIED ITS HEAVY BURDEN AND HAS NOT SHOWN THAT DEFENDANT'S DECISION TO AWARD THE CONTRACT TO DEFENDANT–INTERVENOR HAD NO RATIONAL BASIS.

Plaintiff has also advanced a spate of arguments to prove that the award of the contract to defendant-intervenor was irrational. The Court has carefully considered those arguments, the extensive factual record, and the underlying law, and it finds that plaintiff has not carried its heavy burden of proof.

A. Plaintiff has not proved that defendant's assessment of risks in plaintiff's proposal lacked a rational basis.

 Plaintiff's initial challenge centers on the S.S.A.'s assessment that plaintiff's proposal presented specification compliance and schedule risks. Plaintiff asserts that the S.S.A. did not articulate a reason for this conclusion but instead simply claimed that plaintiff's proposal was inadequate. This is not so. On the basis of the evidence in the record, the Court finds that there was a rational basis for the S.S.A.'s conclusion.

First, there is no question that the decision to assess the risks inherent in contractor proposals was rational. As the government is charged with choosing the proposal that offers the "greatest value" and is "most advantageous" to the Government, 48 C.F.R. § 15.605, defendant could properly exercise its discretion to find that a risk analysis was proper.

Moreover, plaintiff had full notice that the Boards and the S.S.A. would examine proposal risks. Not only did the Phase Two R.F.P. state that the S.S.A. would analyze the production and compliance risks of each proposal, *Defendant's Exhibit 5*, at M–04, plaintiff was specifically told that

... any contractor proposed Phase-two configuration changes which have either been only partially tested during the Phase-one prototype effort, or are completely untested, will be subjected to a source selection risk analysis designed to assess the probability of success of the change. This assessment will consider both the extent of successful Government testing conducted on the change, and any contractor provided substantiating data or rationale which supports the viability of the change. It is through risk analysis that the Government will evaluate configuration changes which have not had the benefit of being fully proven out through prototype testing.

*Defendant's Exhibit 6*, at 1.

Consistent with these statements, the Boards and the S.S.A. examined the results of the Phase One prototype testing and the Phase Two proposals for specification and production-goal compliance. *Defendant's Exhibit 3*, at parts IV–VI; *Defendant's Exhibit 1*, at 4–7. They found that the Phase One testing revealed many serious technical problems that were widely scattered throughout plaintiff's vehicles. *Defendant's Exhibit 1*, at 3–5; *Defendant's Exhibit 3*, part IV, at 13–27. They also concluded that plaintiff's response to those problems was to redesign its vehicle so extensively that plaintiff was essentially offering the government a "new and untested vehicle." *Defendant's Exhibit 1*, at 4.; *Defendant's Exhibit 3*, part IV, at 13. In light of the extensive changes proposed by plaintiff, these conclusions are not irrational. Nor was it irrational to conclude that an untested vehicle posed a risk, given the many flaws discovered when the prototype trucks were tested.

The findings about production compliance were also rationally based. The Boards found that plaintiff's untested vehicle could have a variety of as-yet undiscovered flaws that would require correction; the information also indicated that plaintiff would be hard pressed to devote

management resources to this potential problem because of its delinquencies on other contracts. *Defendant's Exhibit 3*, at part IV–VI; *Defendant's Exhibit 2*. The Court does not have the expertise to determine whether these assessments were correct. *See, e.g., M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1301 (D.C.Cir.1971). What the Court can clearly see, however, is that the Source Selection Authority had a rational basis for concluding that plaintiff's production goals were unrealistic. *Defendant's Exhibit 1*, at 6.

■ Plaintiff urges the Court to find that, notwithstanding the evidentiary basis for these judgments, defendant could not rationally have ascribed any risk to plaintiff because the contract included a warranty shifting all compliance risk to the contractor. This misapprehends the nature of a warranty and the nature of the risks the government is entitled to minimize.

According to plaintiff,[10] the warranty provision is included in the Phase Two R.F.P., and it states:

> 'the Contractor hereby warrants that the supplies are free from defects in design, material and workmanship and will conform with the specification and all other requirements of this contract for a period of 18 months from the date of acceptance....'

*Plaintiff's Memorandum of Points and Authorities*, at 31 (*quoting Phase Two R.F.P.*, at section H06–b). This warranty does not guarantee that the government will receive defect-free vehicles within the time specified by the contract; rather, it guarantees that the contractor will bear costs if the terms of the warranty are not met. *See, e.g., Clearwater Forest Industries, Inc. v. United States*, 650 F.2d 233, 238, 227 Ct.Cl. 386 (1981); *see also, e.g.,* McBride & Touhey, *Government Contracts* § 27.100 (1987).

Neither this nor any warranty can insulate defendant from the risk that a contractor's nonperformance will injure the government's interest in timely delivery of military vehicles. That interest is profound, and defendant's experienced judgment that awarding the contract to plaintiff would impair that interest may not be challenged lightly. *See, ?.g., Electro–Methods, Inc. v. United States*, 7 Cl.Ct. 755, 762 (1985). The Court finds that defendant's analysis of the risks inherent in plaintiff's proposal, and the resulting risks to specification and production compliance, was rational and does not provide grounds on which to invalidate the contract award.

B. Plaintiff has not proved that any disagreements or inconsistencies between contract evaluators resulted in an irrational contract award.

■ Plaintiff also maintains that the Source Selection Authority's assessment of the risks in plaintiff's proposal was irrational because it ignored findings by other parties involved in the procurement decision. Specifically, plaintiff claims that the Source Selection Authority could not rationally have considered plaintiff's proposal risky when the Cost Evaluation Board implicitly found that the risk was insubstantial; plaintiff also claims that the Source Selection Authority wrongly ignored a pre-award site survey and a production group analysis that favorably evaluated plaintiff's production capacity and performance. Plaintiff is wrong.

The Source Selection Authority has the final voice on the contract award. 48 C.F.R. § 15.612(d). He is not bound by the recommendations of evaluation and advisory groups, and may agree or disagree with the findings submitted by those groups. *See, e.g., Grey Advertising, Inc.*, 76–1 CPD ¶ 11. As such, the procurement award was not rendered irrational by any disagreement between the Source Selection Author-

---

**10.** Plaintiff quoted the warranty provision in its *Memorandum of Points and Authorities* in support of its motion for a preliminary injunction and cited to the page in the Phase Two R.F.P. at which the warranty provision apparently appears. No party, however, has given the Court a copy of that page of the Phase Two R.F.P. As neither defendant nor defendant-intervenor has taken issue with the terms of the warranty as expressed by plaintiff, the Court will assume that plaintiff's quote is accurate.

ity and the cost evaluation team, the pre-award site surveyors, or the production evaluation team. Rather, the SSA properly exercised his discretion to rely upon the substantial record evidence of problems with plaintiff's proposal and production capacity and base his decision on his independent analysis of the record. *See Defendant's Exhibit 1*, at 6; *see also Defendant's Exhibit 11* (rejecting original production capacity analysis as inadequate).

C. Plaintiff has not proved that the manner in which defendant analyzed reliability growth rendered the contract award irrational.

Plaintiff also maintains that the contract award lacked a rational basis because it was based in part on defendant's erroneous assessment of the ultimate reliability of plaintiff's vehicles. Plaintiff argues that defendant relied on the method outlined in AMSAA Technical Report No. 357 and it charges that the methodology described in that report is flawed.

■ To support this claim, plaintiff states that, in contrast to defendant's estimate that plaintiff's vehicles would have an ultimate mean time between failure of 10.96 hours, plaintiff's own reliability-growth testing indicated that, after all corrections were made, plaintiff's trucks would have a mean time between failure of more than 24 hours. This assertion proves nothing.

■ Regardless of the methodology employed by plaintiff in its voluntary reliability testing, plaintiff's point cannot carry.

First, defendant need not employ the testing method of plaintiff's choice as long as the method it uses is rational. *See, e.g., Fort Wainwright Developers*, 86–1 CPD ¶ 459, at 14. Moreover, even if the Court could accept plaintiff's estimate of the mean time between failures of its vehicles, that figure is no better than defendant's estimate that the mean time between failures of TRAK's trucks would range from 17.89 hours to 26.7 hours. *Defendant's Exhibit 3*, Part IV, at 7.[11] Consequently, the Court must reject plaintiff's challenge to the Source Selection Authority's calculation of mean time between vehicle failures, and it finds that the Source Selection Authority's assessment of the reliability of plaintiff's vehicles had a rational basis in the evidence it considered.

D. Plaintiff has not proved that defendant-intervenor is incapable of meeting its production schedule.

■ Finally, plaintiff argues that the S.S.A.'s assessment of risks posed by plaintiff's offer was irrational because the successful bidder was even more likely to fall behind the production schedule. Plaintiff points out that the evaluators found that it would likely deliver the first 184 forklifts within 930 days after contract award, while defendant-intervenor would deliver its first 184 forklifts barely two months earlier; its two-month lag, plaintiff argues, is shorter than the long delay that the evaluators suspected could result from defendant-in-

---

**11.** Moreover, plaintiff's calculations are rendered suspect by the uncertain methodology behind them. In his Supplemental Affidavit, Henry A. Phillips, the Program Manager for Military Materiel Handlers at BMY, states that by using unspecified "standard engineering practices," plaintiff calculated the ultimate mean time between failures of its machines at 24.6 hours. *Supplemental H. Phillips Affidavit*, at ¶ 5. In contrast, BMY's president, Barry L. Phillips, avers that BMY "duplicated" the reliability growth projections made by the Army and found that the actual mean time between failures would be "in excess of 24 hours." *B. Phillips Affidavit*, ¶ 22.

From these affidavits, the Court cannot tell whether plaintiff performed one reliability test or several; nor can the Court tell whether plaintiff used some undetailed "standard" reliability testing method or employed both the allegedly standard method and the method specified in Technical Report No. 357. In light of plaintiff's vituperative attack on the methodology outlined in Report No. 357, the Court must assume that plaintiff employed a different method when testing by "standard engineering practices" from what appears to be a test it performed by the Technical Report's methodology. If plaintiff did indeed perform two tests, it obtained remarkably similar results; far from proving that the Report's methodology is faulty, plaintiff suggests that it is (at least in this instance) fully in line with the undetailed "standard engineering practices" plaintiff urges should have been utilized.

tervenor's need to transfer production to new facilities during contract performance.

The Board's analysis, however, is somewhat different from plaintiff's characterization of it. The Board found that plaintiff would probably slip 255 days behind the production schedule and could incur a 330–day delay if any of the major design changes it proposed proved faulty. *Defendant's Exhibit 2*, at 16. In contrast, the Board found that defendant-intervenor would probably fall 45 days behind schedule and would at most face a 210–day delay in meeting the production schedule. *Id.* at 15–16.[12]

Plaintiff suggests that, due to defendant-intervenor's relative inexperience in meeting large government contracts, as well as its need to expand its facilities, the Board and the Source Selection Authority could not rationally have concluded that defendant-intervenor could complete the contract within the predicted time horizon. It is true that the Board's findings imply that expansion or transfer of TRAK's production facilities could result in delays over and above the 210–day point. *See Defendant's Exhibit 3*, part VI, at 5. But there is nothing in the record, other than plaintiff's assertions, to indicate that TRAK's transfer to a new production site would result in delays longer than those expected at plaintiff's own production facilities.

Plaintiff has the burden of proving that the Source Selection Authority's assessment of production capacity and likely delays lacked a rational basis. While plaintiff has raised legitimate questions about the SSA's decisions, it has not shown that there is no rational basis for them. Accordingly, the Court finds that plaintiff has not carried its "heavy burden" of proving

that the decision to award the contract to TRAK International was irrational, and it must reject plaintiff's challenge to the contract award.[13]

## CONCLUSION

This case centers on defendant's two-year effort to procure forklift trucks for military use. Defendant found that BMY's forklifts carried the lowest price tag but were plagued by serious and widely scattered structural and technical flaws. Defendant found that the forklifts produced by TRAK International were also imperfect but in ways that were more easily and reliably corrected. Although cost was the single most important factor in the procurement analysis, defendant found that the risks associated with BMY's forklifts were so substantial that they outweighed the attractiveness of BMY's lower initial price; moreover, defendant found that those risks could well result in a higher lifetime cost for BMY's vehicles than for TRAK's. Accordingly, defendant awarded the contract to TRAK International.

BMY, the disgruntled bidder, has suggested that the procurement procedure and award were inadequate for a multitude of reasons. Much of its dissatisfaction with the contract award results from its own misinterpretation of the process governing this procurement. Plaintiff believed that the Army would conduct a price competition in the second phase of the procurement among offerors whose technical competence was proved when they were chosen to participate in prototype testing. Neither logic nor the clear language of the Requests for Proposals supports this view.

---

**12.** This major difference may seem difficult to explain, and, as Defendant's Exhibit 2 is not a model of clarity, the Court is not altogether certain about the extent of the Board's examination of the production schedules. What is clear to the Court, however, is that plaintiff's claims concern only production of the first 184 vehicles, whereas the contract contemplates production of at least 1800 vehicles. *See Defendant's Exhibit 5*, Section A, at 2. It is possible that defendant's analysis of production lags is based on production of the entire 1800 vehicles,

although the report's language is too vague to allow conclusions on this point.

**13.** Plaintiff has also argued that defendant's refusal to stay the contract award was arbitrary and capricious. In light of the Court's judgment in defendant's favor, this issue is of little relevance. Nonetheless, the Court will note that defendant followed the terms of the Competition in Contracting Act and it did not err by rejecting plaintiff's application for a stay. *See* 31 U.S.C. § 3553(b)(1), (d)(1).

This procurement was not perfect. But it did not violate laws or regulations in any way that prejudiced BMY. After long investigation and analysis, the Proposal Evaluation Boards rationally recommended awarding the contract to TRAK International, and the Source Selection Authority had a rational basis for accepting that recommendation. Consequently, the Court will not disturb the contract award. It must deny plaintiff's request for injunctive relief, and it will enter judgment in favor of defendant and defendant-intervenors.

The Court will memorialize these findings in an Order that will accompany this Opinion.

### ORDER

In accordance with the Opinion in the above-captioned case, issued of even date herewith, and for the reasons set forth therein, it is this 2nd day of September, 1988,

ORDERED that plaintiff's motion to strike the Second Declaration of Joel G. Wagner shall be, and hereby is, denied; and it is

FURTHER ORDERED that plaintiff's motion to strike defendant's supplemental Proposed Finding of Fact and Conclusion of Law shall be, and hereby is, denied; and it is

FURTHER ORDERED that the Court hereby enters judgment in favor of defendant and defendant-intervenor in this case; and it is

FURTHER ORDERED that this case shall stand dismissed from the dockets of this Court.