**SARATOGA DEVELOPMENT CORPORATION,**
Plaintiff,

v.

**UNITED STATES of America, et al., Defendants.**

Civ. A. No. 90–0474.

United States District Court, District of Columbia.

Oct. 31, 1991.

**30**

Bruce A. Baird, Covington & Burling, Washington, D.C., for plaintiff.

Richard N. Reback, Asst. U.S. Atty., Washington, D.C., for defendants U.S. and Pennsylvania Ave. Development Corp.

Steven W. Widerman, Arent, Fox, Kintner, Plotkin & Kahn, Washington, D.C., for defendants intervenors Delta Partnership and Federal Triangle Corp.

## MEMORANDUM OPINION

JOHN H. PRATT, District Judge.

Before the Court are plaintiff Saratoga Development Corporation's motion for partial summary judgment, defendant United States' motion for summary judgment, their respective replies, and defendant-intervenor Delta Partnership's opposition to plaintiff's motion.

### I.

The parties do not dispute the following facts. This is a "disappointed bidder" case in which plaintiff Saratoga Development Corporation ("Saratoga") challenges the decision of the Pennsylvania Avenue Development Corporation ("PADC") selecting Delta Partnership ("Delta") to develop the Federal Triangle site.

The PADC is a wholly-owned government corporation created by Congress. 40 U.S.C. §§ 871–85. Its mandate is to ensure the suitable development, maintenance, and use of Pennsylvania Avenue and the area adjacent to the Avenue between the Capitol and the White House. The Federal Triangle Development Act, 40 U.S.C. § 1101–09, added the Federal Triangle site to the PADC development area and directed the PADC to prepare a proposal for development of that site in consultation with the General Services Administration ("GSA") and the International Cultural and Trade Center Commission ("ICTCC"). The Act authorized the construction on the Federal Triangle site of a new federal office building, second in size only to the Pentagon, to house an International Cultural and Trade Center ("ICTC") and to consolidate a number of agencies currently scattered in various locations throughout the Washington Metropolitan area. In addition, the Federal Triangle Project is expected to house exhibits, performing arts theatres, retail space, and conference areas.

The PADC began soliciting proposals to develop the Project in November, 1988. Administrative Record ("AR"), tab 2. The PADC issued an elaborate Prospectus for the Federal Triangle Project that set forth eight bid criteria and building requirements. These criteria were: (1) responsiveness of the design to the goals and objectives of the development program; (2) responsiveness of the design to the urban design objectives, architectural criteria, and historic preservation considerations; (3) a schedule that allowed for completion of the facade by January 1993, and completion of the entire project by 1994; (4) the experience, capability, and resources of the development team; (5) the financial experience, resources, and commitment of the developer; (6) the projected costs; (7) project management experience; and (8) an affirmative action plan. AR, tab 20(a) at 29–30. Seven development teams submitted proposals by the June 1, 1989 cut-off date. Each development team then gave an oral presentation of its proposal to the PADC Board of Directors (the "Board"), the PADC staff, and representatives of the GSA and the ICTCC. AR, tab 39. In addition, the PADC engaged both its staff and teams of outside consultants to assist it in reviewing and evaluating the proposals. Extensive reviews ensued, which included numerous written questions to each development team to obtain information for the purpose of clarifying and explaining the given proposal. *See, e.g.*, AR, tabs 22(b), (d), (e).

On October 18, 1989, the PADC Board convened to select the development team for the Federal Triangle Project. It initially met in executive session with its staff, the Mayor of the District of Columbia, the Administrator of the GSA, and the Chairman of the ICTCC. After the executive session was concluded, the Board opened its meeting to the public. Before it proceeded to vote on which proposal to select,

however, the Board adopted two resolutions concerning the Federal Triangle Project. First, a resolution eliminating the financial experience, resources, and commitment criteria from the Prospectus was proposed.[1] AR, tab 16. Without discussion, the resolution was adopted. AR, tab 40 at 126.

The second resolution which the Board considered before the selection vote concerned affirmative action. The resolution called for the following: (1) incorporation into the development agreement with the PADC of documented evidence that the selected developer will reach all affirmative action goals required by the Prospectus; (2) the PADC's encouragement of the selected developer to enhance minority participation by recruiting minorities listed in unsuccessful proposals; (3) an agreement for so-called "first source" employment with the District of Columbia Department of Employment Services; and (4) the establishment of a quarterly affirmative action reporting system. AR, tab 17. The resolution was passed unanimously. AR, tab 40 at 130.

The Board then proceeded to the vote on whom to select for the Federal Triangle Project. After brief discussion, the Board, voting by secret ballot, selected the defendant-intervenor Delta. AR, tab 18. The tally was Delta, seven votes; BPT, three votes; Great Plaza, two votes; and Prentiss, one vote.[2] AR, tab 40 at 142. Delta having received the necessary majority, the Board then formally adopted a resolution selecting it as the developer for the Federal Triangle Project. AR, tab 18.

Approximately one week later, Saratoga sent a letter to the PADC "tak[ing] exception to the outcome of the competition and the manner in which it was reached." Memorandum in Support of Saratoga's Motion for Partial Summary Judgment and in

---

1. The PADC had previously written to each team to advise them to be prepared during their oral presentations to address the issue of decoupling the financing criteria from the development competition. AR, tab 11. Saratoga at that time did not state its opposition to this idea. AR, tab 11(a).

2. When at full strength, the PADC Board consists of 15 voting members. The 13 ballots cast in this vote reflect the fact that one Board member had recused himself and there was one vacancy on the Board. AR, tab 40 at 1.

Opposition to Defendants' Motions to Dismiss and for Summary Judgment, exhibit B, tab 2 ("Saratoga Motion"). On November 8, 1989, the Chairman of the PADC responded by referring Saratoga to the selection criteria in the Prospectus and stating that "each proposal was carefully reviewed, analyzed and considered in light of the stated criteria." *Id.* By letter dated November 22, 1989, Saratoga replied by again stating its position that it believed "the PADC ha[d] departed, both obviously and materially, from its own articulated criteria." *Id.*[3]

Ultimately, on March 1, 1990, Saratoga filed this cause of action seeking judicial review of the PADC's actions in connection with the award of the Federal Triangle Project.

## II.

As a preliminary matter, defendants raise numerous procedural defenses. Defendants assert that plaintiff lacks constitutional and prudential standing, that plaintiff has failed to join an indispensable party, that the complaint is barred by laches, and that the PADC's action in this case is unreviewable as a matter of law. We will discuss these in turn.

### A. *Constitutional Standing*

■ Defendants assert that plaintiff lacks constitutional standing because it was not a bidder in this instance. While defendants admit that it is well-settled that a disappointed bidder who can show injury in fact can have standing to challenge the award of a government contract, *Scanwell Laboratories, Inc. v. Shaffer,* 424 F.2d 859 (D.C.Cir.1970), defendants analogize the instant dispute to the facts of *Control Data Corp. v. Baldrige,* 655 F.2d 283, 292 (D.C.Cir.), *cert. denied,* 454 U.S. 881, 102 S.Ct. 363, 70 L.Ed.2d 190 (1981), where the plaintiff was not a bidder.

Defendants argue that plaintiff in this cause of action does not satisfy the test for constitutional standing because plaintiff

did not submit a bid for the development. Instead, plaintiff was merely half of a team (along with James Crozier & Company) that submitted a bid as co-developers. *Control Data* does not so limit *Scanwell Laboratories.* In *Control Data,* plaintiff was not part of a bid team; it was a non-bidder claiming the right to challenge rules promulgated by the Secretary of Commerce. Indeed, *Control Data* was not a "disappointed bidder" case at all because there was no contract at issue being bid upon. Saratoga, unlike the plaintiff in *Control Data,* was a bidder. *Control Data* does not stand for the proposition that every member of a bid team must be a party to an action for constitutional standing to exist, nor have defendants cited to any cases which so hold. Plaintiff here has constitutional standing as a "disappointed bidder" under *Scanwell Laboratories.*

### B. *Prudential Standing*

■ Defendants also argue that plaintiff lacks standing on prudential grounds because it was not within the "zone of active consideration." *National Fed'n of Fed. Employees v. Cheney,* 883 F.2d 1038 (D.C.Cir.1989), *cert. denied,* — U.S. —, 110 S.Ct. 3214, 110 L.Ed.2d 662 (1990). The court in *National Federation* stated that

Not every bidder in a solicitation may assert disappointed bidder standing, otherwise nuisance suits could handicap the procurement system. Rather, standing is conferred only to those bidders who are " 'within the zone of active consideration' for the bid's award."

*Id.* at 1053 (quoting *National Maritime Union of Am. v. Commander, Military Sealift Command,* 824 F.2d 1228, 1237–38 n. 12 (D.C.Cir.1987); other citations omitted).

The language of *National Maritime* makes it apparent that this doctrine should be invoked sparingly. It is designed to weed out those cases where the "bidder ... believed that it would have no significant

**3.** In addition, Saratoga at this time made a request for documents from the PADC pursuant to the Freedom of Information Act. Saratoga Motion, exhibit B, tab 4. This facet of the dispute is not relevant to resolving the motions being decided here.

likelihood of obtaining the bid," but none-theless brings suit "for its nuisance value." *National Maritime*, 824 F.2d at 1237 n. 12. As the Federal Circuit stated in an opinion cited to approvingly in *National Maritime*, a disappointed bidder need not show that the activity it complains about was the but for cause of its failure to procure the contract, only that it had a "substantial chance" of receiving the award. *CACI, Inc.–Federal v. United States*, 719 F.2d 1567, 1574 (Fed.Cir.1983). In *CACI*, the Court found that the plaintiff was within the zone of active consideration (having satisfied the "substantial chance" test) where it was one of six companies that qualified to submit a best and final offer, and its score on the offer placed it second to the awardee. *Id.* at 1575.

In determining if a bidder falls within the zone of active consideration, a court is not concerned with which bidder had the "best" proposal, or who "should" have won the contract. Such determinations are best left to the expertise of agencies like the PADC. The question when deciding whether to invoke this prudential standing doctrine is merely whether the bidder's proposal was strong enough that a reasonable selection body could have picked it.

The record in this case is rife with evidence that Saratoga was within the zone of active consideration for the Federal Triangle Project contract. Of the relatively few comments made by Board members at the PADC meeting of October 18, 1989 before balloting occurred, one specifically singled out Saratoga for its "intrigu[ing]" proposal while also alluding to a possible drawback of the plan. AR, tab 40 at 138. Most proposals were not commented upon at all. In addition, the District of Columbia stated that Saratoga was "one of the three [development teams] with the most merit among the competitors," Saratoga Motion, exhibit H at 10, whereas the ultimate awardee, Delta, was "not among the top contenders." *Id.* at 7. It is also significant that by the PADC staff's own estimates given to the Board immediately before the vote, Saratoga was the low bidder. AR, tab 35 at 8. While this obviously was not merely a "low bid" contract, the fact that Sarato-

ga's proposal was the least expensive is persuasive evidence that it had a substantial chance of receiving the award.

Defendants argue that Saratoga's failure to receive any of the 13 votes cast by PADC Board members demonstrates that Saratoga was not within the zone of active consideration. Defendants cite to no cases which hold that a bidder who receives no votes in the award balloting is not within the zone of active consideration, and we decline to so hold. Indeed, a bidder could be every board member's second choice, but they could split in a close vote on who the top choice is. Certainly such a bidder is within the zone of active consideration.

Instead of a simplistic "no votes" method of determining whether a bidder was in the zone of active consideration, we will follow the courts' approach in *CACI* which was to view the totality of the circumstances and determine whether the bidder had a "substantial chance" of receiving the award. Based upon the facts stated above, we believe that plaintiff had such a chance and was within the zone of active consideration.

### C. *Failure to Join Indispensable Party*

■ Defendants argue that this complaint should be dismissed under Rule 19 of the Federal Rules of Civil Procedure ("FRCP") for failure to join an indispensable party, namely Saratoga's co-developer, James Crozier. Dismissal is not required because Crozier is not an indispensable party under FRCP 19(a)(1) or (2).

A person is an indispensable party under FRCP 19(a)(1) where complete relief cannot be accorded in that person's absence. Complete relief, such as ordering the contract to be rebid, could, however, be accorded here with or without Crozier.

FRCP 19(a)(2) states that a person should be joined if he

claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a

substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest. Any potential problem under FRCP 19(a)(2) was disposed of by the affidavit submitted by Crozier waiving all right to pursue his interest in this matter against the government in subsequent litigation. *Saratoga Motion, exhibit G.* The waiver of rights unmistakably demonstrates that Crozier does not feel prejudiced by the continuation of this litigation in his absence and will not pursue an independent claim thereby prejudicing defendants. Dismissal of this case is thus not required.

### D. *Laches*

■ The equitable doctrine of laches provides an affirmative defense where there has been an inexcusable delay in asserting a claim and the delay prejudices the defendant. *Gull Airborne Instruments, Inc. v. Weinberger,* 694 F.2d 838, 843 (D.C.Cir. 1982). Here, there was no such lack of diligence.

As our Circuit has pointed out, laches reflects the principle that equity does not aid "those who slumber on their rights." *Id.* (quoting *Powell v. Zuckert,* 366 F.2d 634, 636 (D.C.Cir.1966)). While it is true that Saratoga did not file its complaint until four-and-a-half months after the contract had been awarded, it cannot be said that Saratoga was slumbering on its rights. Instead, as stated earlier, Saratoga protested the award almost immediately and filed suit only after it had vigorously pursued other avenues of complaint. It would be foolish to penalize a party for making a good faith effort at resolving a dispute through extra-judicial channels before turning to the over-burdened court system. *See id.* at 844 ("it would be an injustice to unsuccessful bidders [to] penalize[ ] them [by invoking the doctrine of laches] merely for exhausting ... administrative remedies"). The cause of action, therefore, is not barred by laches because there was no inexcusable delay in asserting a claim.

Defendants state in the alternative that plaintiff should be barred from asserting its argument regarding the severing of the financing criterion because plaintiff had the option during its oral presentation before the Board to object to the action. Having failed to do so at that time, defendants argue, plaintiff should not now be heard to complain about the deletion. This argument does not persuade the Court. Failure on the part of Saratoga to state its opposition to the deletion of a selection criterion was not a waiver by it of the ability to contest whether the deletion was handled in accordance with the applicable laws and regulations. At the time of the oral presentations, defendants had not yet deleted the criterion. Thus Saratoga was not at that time "slumbering on its rights" because no claim had arisen. *See Rozen v. District of Columbia,* 702 F.2d 1202, 1203–04 (D.C.Cir.1983).

### E. *Reviewability of PADC Action*

■ The last of defendants' procedural defenses is that the PADC's action in this case is unreviewable as a matter of law. Defendants assert that this Court must dismiss plaintiff's lawsuit because the PADC's actions at issue here are committed to the agency's discretion.

Under 5 U.S.C. § 701(a)(2), an agency's actions will be found to be "committed to agency discretion by law," and hence unreviewable, where "statutes are drawn in such broad terms that in a given case there is no law to apply." *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971) (quoting S.Rep. No. 752, 79th Cong., 1st Sess., 26 (1945)). In *Heckler v. Chaney,* 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985), the Supreme Court reaffirmed the holding of *Overton Park* and stated that "if no judicially manageable standards are available for judging how and when an agency should exercise its discretion" then § 701(a)(2) precludes review. *Id.* at 830, 105 S.Ct. at 1655. As the Court has noted, however, § 701(a)(2) "is a very narrow exception." *Overton Park,* 401 U.S. at 410, 91 S.Ct. at 820; *see also Chaney,* 470 U.S. at 838, 105 S.Ct. at 1659.

Defendants point out that Congress provided the PADC with substantial latitude in the discharge of its responsibilities general-

ly, 40 U.S.C. § 875(1) (granting the PADC "all necessary and proper powers for the exercise of the authorities vested in it"), and with regard to the Federal Triangle Project specifically. 40 U.S.C. § 1101(b)(2) (allowing the PADC to "exercise such power [over the Federal Triangle Project] as may be necessary to further the public interest"). In addition, defendants highlight the portion of the Federal Triangle Development Act relating to the selection process for the Project. The law states that the competition for the Federal Triangle Project contract "shall be conducted in accordance with the existing policies and procedures of the [PADC]." 40 U.S.C. § 1104(a)(3).

While defendants acknowledge that the complete absence of any law against which to judge an agency action is rare, they argue that this is such an instance because the PADC's authority to "exercise such power as may be necessary to further the public interest" deprives the court of any meaningful benchmark against which the agency's action can be measured. This is not so. The agency's actions may be measured against the judicially manageable standards of applicable federal procurement law. *See* 41 U.S.C. §§ 251–60. While the language of the PADC's enabling legislation and the Federal Triangle Development Act is broad, this breadth does not give the PADC carte blanche to ignore all other laws.

This case is easily distinguishable from other instances where judicial review has been denied under § 701(a)(2). *Chaney,* for example, involved an agency's refusal to take action, not an affirmative act, and the holding was so limited. 470 U.S. at 831, 105 S.Ct. at 1655. Another such case, *Webster v. Doe,* 486 U.S. 592, 108 S.Ct. 2047, 100 L.Ed.2d 632 (1988), was decided against the unique backdrop of national security concerns, a realm in which courts have traditionally shown greater deference. *See CIA v. Sims,* 471 U.S. 159, 105 S.Ct. 1881, 85 L.Ed.2d 173 (1985); *Snepp v. United States,* 444 U.S. 507, 100 S.Ct. 763, 62 L.Ed.2d 704 (1980). *Webster* involved a challenge to a decision by the CIA to remove an employee who informed it that he was a homosexual. The statute at issue there explicitly stated that the "Director of Central Intelligence may, *in his discretion,* terminate the employment of any … employee…." 50 U.S.C. § 403(c) (emphasis added). That unequivocal and complete grant of discretionary power truly left the Court with no law to apply as required by *Overton Park.* No such language exists in the statutes at issue here and judicially manageable standards clearly exist in the guise of the federal procurement laws.

In addition, several decisions by our Circuit Court cited to by defendants are inapposite. For instance, *Slyper v. Attorney General,* 827 F.2d 821 (D.C.Cir.1987), *cert. denied,* 485 U.S. 941, 108 S.Ct. 1121, 99 L.Ed.2d 281 (1988), involved a provision of the Immigration and Nationality Act which allowed the Director of the United States Information Agency to recommend waiver of a statutory requirement that foreign medical students first return to their country of origin before being allowed to apply for residency status in the United States. 8 U.S.C. § 1182(e). The statute merely provided that waiver required the "favorable recommendation" of the Director, and the applicable regulations only stated that the Director "will review the policy, program and foreign relations aspects of the case." 22 C.F.R. § 514.32(a). Concluding that both the statute and the regulation were "equally devoid of meaningful direction," the Court found that there was "no standard against which to assess the Director's exercise of discretion," and hence it was unreviewable. 827 F.2d at 824. *Accord Dina v. Attorney General,* 793 F.2d 473 (2nd Cir.1986); *Abdelhamid v. Ilchert,* 774 F.2d 1447 (9th Cir.1985); *contra, Chong v. Director, USIA,* 821 F.2d 171 (3rd Cir. 1987).

In another § 701(a)(2) case cited to by defendants, the Circuit Court held that a decision of the Department of Justice not to provide legal representation for a federal employee sued in her individual capacity was committed to agency discretion by law and hence unreviewable. *Falkowski v. EEOC,* 764 F.2d 907 (D.C.Cir.1985), *reh'g denied,* 783 F.2d 252 (D.C.Cir.1986), *cert.*

*denied sub nom. Falkowski v. United States Dep't of Justice,* 478 U.S. 1014, 106 S.Ct. 3319, 92 L.Ed.2d 727 (1986). The Court concluded that 28 U.S.C. § 517, which empowered the Attorney General to send a lawyer into court "to attend to the interests of the United States" did not provide a sufficiently meaningful standard to allow review. Stressing that the Attorney General "acts in the context of a lengthy history of discretionary authority" and that there was "no colorable claim that the Department's refusal to furnish appellant with a lawyer transgresses any constitutional right," the Court concluded that the determination not to provide counsel was unreviewable. 783 F.2d at 253–54. *See also United States Information Agency v. Krc,* 905 F.2d 389 (D.C.Cir.1990) (broad termination provision in the Foreign Service Act, 22 U.S.C. §§ 4131 *et seq.,* provides no judicially manageable standards); *National Federation of Federal Employees v. United States,* 905 F.2d 400 (D.C.Cir.1990) (no judicially manageable standards for review of decision of Secretary of Defense to close certain military bases).

These cases are distinguishable from the case *sub judice.* First, as noted earlier, the context for a holding of non-reviewability in this Circuit has usually been in cases involving national security or national defense related agencies and issues, an area in which courts usually show greatest deference. In addition, none of these cases arose against the backdrop of such a judicially manageable set of standards as the federal procurement laws. In each of these cases, the principal statute at issue contained no such standards *and* the Court was left with no other statute to rely upon to supply a standard for review. Here, although the PADC enabling legislation and the Federal Triangle Development Act are written in broad terms, the Court has available to it the judicially manageable standards of the procurement laws to supply a means of review for the PADC's actions. As this Circuit has stated,

> The mere fact that a statute gives broad discretion to an agency does not render the agency's decisions completely non-reviewable under the "committed to agency discretion by law" exception unless the statutory scheme, *taken together with other relevant materials,* provides absolutely no guidance as to how that discretion is to be exercised.

*Robbins v. Reagan,* 780 F.2d 37, 45 (D.C.Cir.1985) (emphasis added). It cannot be said that this statutory scheme taken together with other relevant materials, such as the federal procurement laws, provides absolutely no guidance as to how the PADC may exercise its discretion here.

The instant case is more analogous to *CC Distributors, Inc. v. United States,* 883 F.2d 146 (D.C.Cir.1989), where the Court found that § 701(a)(2) did not bar judicial review of the Air Force's decision to take procurement of certain materials in-house. Specifically, the Court found that although § 1223 of the National Defense Authorization Act for Fiscal Year 1987, Pub.L. 99–661, 100 Stat. 3816, 3977 (1986), did not provide a meaningful standard against which to judge the agency's exercise of discretion, certain Defense Department procurement regulations did provide standards suitable for judicial review. *CC Distributors,* 883 F.2d at 153–56. The same situation exists here. Although the PADC enabling legislation and the Federal Triangle Development Act may not provide manageable judicial standards for review, the federal procurement laws do, as they have in innumerable cases since *Scanwell Laboratories.*

We remind defendants that this Circuit has reiterated that the § 701(a)(2) exception is still a "very narrow" one, *Falkowski,* 783 F.2d at 253, and that there is still a "strong presumption" in favor of judicial review of administrative actions. *Bowen v. Michigan Academy of Family Physicians,* 476 U.S. 667, 670, 106 S.Ct. 2133, 2136, 90 L.Ed.2d 623 (1986); *Block v. Community Nutrition Inst.,* 467 U.S. 340, 349, 104 S.Ct. 2450, 2456, 81 L.Ed.2d 270 (1984); *Armstrong v. Bush,* 924 F.2d 282, 290 (D.C.Cir.1991). Defendants have cited to nothing that causes us to believe that this presumption has been overcome here.

## III.

■ Plaintiff's fundamental assertion is that the PADC made substantial changes in two of its eight criteria for the Federal Triangle Project without revising its solicitation or allowing for amended proposals, and that this constitutes a violation of federal procurement law. The question this Court has before it is whether the PADC committed "a clear and prejudicial violation" of the procurement laws. *BMY, A Div. of Harsco Corp. v. United States,* 693 F.Supp. 1232, 1238 (D.D.C.1988) (quoting *Kentron Hawaii Ltd. v. Warner,* 480 F.2d 1166 (D.C.Cir.1973)). Our role is a limited one, circumscribed by the deference due to the agency and its expertise. *Delta Data Sys. Corp. v. Webster,* 744 F.2d 197, 203–04 (D.C.Cir.1984) ("procurement decisions [are] ... be[st] left to the expertise of an executive agency") (citations omitted).

The Administrative Procedure Act ("APA") provides that "[t]he reviewing court shall ... hold unlawful and set aside agency action, findings and conclusions found to be ... without observance of procedure required by law." 5 U.S.C. § 706(2). The applicable law here, the Competition in Contracting Act ("CICA"),[4] requires that "[a]n executive agency shall evaluate ... competitive proposals based solely on the factors specified in the solicitation," 41 U.S.C. § 253b(a), and that it "award a contract ... to the responsible source whose proposal is most advantageous to the United States, considering only price and the other factors considered in the solicitation." 41 U.S.C. § 253b(d)(4).

Similarly, regulations implementing the procurement laws require that "[a]n agency ... evaluate competitive proposals based solely on the factors specified in the solicitation." 48 C.F.R. § 15.608(a). In addition, regulations require that "[i]f a change is so substantial that it warrants complete revision of a solicitation, the contracting officer shall cancel the original solicitation and issue a new one, regardless of the stage of the acquisition." 48 C.F.R. § 15.606(b)(4). A "contracting officer shall not award a contract unless any amendments made to an RFP have been issued in sufficient time to be considered by prospective offerors." 48 C.F.R. § 15.410(b).

The PADC made a significant change in at least one of its eight criteria. Minutes before its final vote, PADC passed a resolution deleting its financing criterion. In doing so, the PADC altered the factors specified in the solicitation such that bidders were not evaluated according to the factors they relied upon in making their proposals. The Prospectus stated unambiguously that the financing criterion was of substantial importance. "Financial experience, resources, and commitment," the Prospectus stated, "are essential elements that the [PADC] will evaluate." AR, tab 20(a) at 30.

---

4. CICA applies to all conduct related to procurement by an executive agency except for limited types which are statutorily excluded (and not relevant here) and "in the case of procurement procedures otherwise expressly authorized by statute." 41 U.S.C. § 253(a)(1). PADC is a wholly owned government corporation, 31 U.S.C. § 9101, and thus falls within the definition of executive agency. 40 U.S.C. § 472.

While the Federal Triangle Development Act states that the Federal Triangle Project competition "shall be conducted in accordance with existing policies and procedures of the [PADC] for a development competition," 40 U.S.C. § 1104(a)(3), such a grant of authority does not exclude the PADC from the federal procurement laws such as CICA. Express authorization is required by the statute and caselaw. *See, e.g., Andrus v. Glover Construction Co.,* 446 U.S. 608, 616–17, 100 S.Ct. 1905, 1910–11, 64 L.Ed.2d 548 (1980) (where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied in the absence of a contrary legislative intent); *Yosemite Park v. United States,* 217 Ct.Cl. 360, 582 F.2d 552, 558–59 (1978); *Design Pak, Inc. v. Baker,* 639 F.Supp. 301, 302 (D.Mass.1986). In *Design Pak,* for example, the applicable statute provided: "No provision of law governing procurement or public contracts shall be applicable to the procurement of goods or services necessary for carrying out the provisions of this title...." 639 F.Supp. at 302 (quoting Statute of Liberty–Ellis Island Commemorative Coin Act, Title I, P.L. 99–61, § 107, 99 Stat. 113 (1985)).

The statute at issue here does not so expressly exempt the PADC from the federal procurement laws. It merely states that the PADC shall use its adopted procedures, not that the PADC shall not also follow the generally applicable procurement laws. The two should not be mutually exclusive. There being no explicit exemption from CICA and the other procurement laws, they apply.

The change in another of the eight selection criteria was more subtle. At the same time that the financing criterion was deleted, the PADC passed a resolution requiring the selected developer to "make an extended, documented, good faith effort to include minority and women business participants from the development teams that were not selected." AR, tab 17. Defendants argue that the resolution did not in any way affect the weight to be given to the affirmative action criterion. While defendants are correct that the resolution did not explicitly change or delete the affirmative action criterion, there can be little doubt that the effect of the resolution was to devalue the weight of this criterion. If the selected developer may "cherry pick" from unsuccessful proposals, it is clearly less significant whether or not a given team submitted a proposal which excelled in the affirmative action criterion, because that team could simply enhance its program with personnel from its competitors.

The question before the Court, therefore, is whether the procedures under which the two changes in the selection criteria were made violated these statutes or regulations. While it is true that "[c]ontracting agencies have broad discretion to amend terms of a solicitation," when such a departure from the original selection criteria occurs, all offerors should be informed of the change and provided with an opportunity to restructure their proposals in light of the new evaluation scheme. *Superior Engineering and Electronics Co.*, 89-2 CPD ¶ 574 at 2 (Dec. 20, 1989) (citations omitted). However, a protest on this basis will only be sustained where the changes in question "affected the selection decision or otherwise was prejudicial to the protestor." *FKW Incorporated Systems; ColeJon Mechanical Corp.*, 89-2 CPD ¶ 370 at 5 (Oct. 23, 1989) (citations omitted).

Numerous opinions of the Comptroller General have sustained protests of the award of contracts where the offerors were given no opportunity to respond to the deletion or relaxation of selection criteria. In *TMC, Inc.*, 88-1 CPD ¶ 492 (May 24, 1988), for example, the Department of Agriculture materially modified the evaluation criteria for two requests for proposals after the submission of initial proposals, but made the award on the basis of the initial proposals without allowing amended offers. The protest was sustained because "all offerors within the competitive range should [have] be[en] given an opportunity ... to revise their proposals accordingly." *Id.* at 2. *Accord Cylink Corp.*, 91-1 CPD ¶ 384 (April 18, 1991); *Local Terracom; Marconi Italiana*, 87-1 CPD ¶ 182 (Feb. 18, 1987).

Each of the changes complained of in the instant action was made minutes before the final vote on the Federal Triangle Project contract. Obviously, no entrant had the time or opportunity to consider these amendments to the selection criteria before the contract was awarded. Under these cases, therefore, the contract was awarded to Delta in violation of the federal procurement laws. In addition, 48 C.F.R. § 15.-410(b), which provides that a "contracting officer shall not award a contract unless any amendments made to an RFP have been issued in sufficient time to be considered by prospective offerors," was violated. Here, the selection criteria were the functional equivalent of a "request for bid." In addition, it is of no consequence when the PADC first discussed the possibility of these amendments, because they were not issued until moments before the vote.

■ This analysis, however, only goes to the first prong of the test. Not only must plaintiff show that the law was violated, but in order to prevail, plaintiff must also show that it was prejudiced by the violations. *BMY*, 693 F.Supp. at 1238. The test for prejudice in this context is whether the "protestor would have altered its proposal to its competitive advantage had it been given the opportunity to respond to an altered requirement." *Warren Electrical Construction Corp.*, 90-2 CPD ¶ 34 at 9 (July 16, 1990).

Plaintiff has not alleged or shown any such prejudice. Plaintiff complains strenuously that it was prejudiced by the deletion of the financing criterion and in the change

in the affirmative action criterion because plaintiff ranked highly in these discrete categories and was therefore lowered in the overall rankings by these changes. Such allegations, however, do not make out a showing of prejudice. Nowhere does plaintiff assert that had it been given the opportunity to respond to the altered selection criteria, it would have altered its proposal to its competitive advantage. Instead, plaintiff states that the changes in and of themselves prejudiced its position relative to its competitors. This is obviously insufficient to make out a showing of prejudice. The government is permitted to make whatever changes in the selection criteria it wishes; all that it must do is ensure that the offerors have sufficient opportunity to respond to the changes. There is nothing in the record to suggest that Saratoga would have responded to the changes with any amendments to its proposal which would have been to its competitive advantage. Therefore, no prejudice to plaintiff has been shown.

### IV.

■ Plaintiff's remaining claim is that the PADC's award of the Federal Triangle Project contract to Delta violates the APA because it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Our standard for the review of such claimed violations is limited and narrow. We are not authorized to conduct a *de novo* review of the facts or to substitute our judgment for that of the agency. *See Florida Power & Light Co. v. Lorion,* 470 U.S. 729, 744, 105 S.Ct. 1598, 1607, 84 L.Ed.2d 643 (1985); *Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973); *Overton Park,* 401 U.S. at 416, 91 S.Ct. at 823–24. In the field of government contracts in particular, the Court of Appeals for the D.C. Circuit has cautioned that the prohibition against "improperly intruding into the agency's decisionmaking process ... has special force." *Delta Data,* 744 F.2d at 203–04 (internal quotations and citations omitted); *see M. Steinthal & Co. v. Seamans,* 455 F.2d 1289, 1298–99 (D.C.Cir.1971) ("In the field

of government procurement the courts must be sedulous to [exercise its authority] with restraint less the courts fall into the error of supposing that they may revise action simply because [they] happen to think it ill-considered, or to represent the less appealing alternative solution available.") (internal quotations and citations omitted).

Finally, in addition to failing to show prejudice, plaintiff has not carried its burden of showing that the PADC's award violated this provision of the APA. Plaintiff's evidence appears to be the following: (1) the administrative record is "laden with suggestions that Delta's selection as the winning team in this competition owed more to influence peddling than to the superior merits of its proposal," Saratoga Motion at 48–49; (2) the cost criterion was minimized; (3) other flaws in Delta's proposal were overlooked; and (4) the administrative record is incomplete and does not reflect contemporaneous reasons for the PADC's decision.

We can dispose of the first allegation quickly. Plaintiff cites to no material to substantiate its charge. Such a bald, conclusory statement without facts to back it up does not deserve to be taken seriously, much less responded to.

Saratoga's second allegation is equally without merit. As stated earlier, this was not a "low bid" competition. Cost was but one of eight equally weighted factors in the original competition, and one of seven factors considered before the final vote. *See* AR, tab 20(a) at 29–30 (setting out the selection criteria and stating that the PADC would pick the developer who "best satisfies all of the ... criteria"). The PADC assessed project cost not in a vacuum, but in relation to its determination of the quality of the Project to be created. While plaintiff may have thought that it could win this contract merely by submitting the low bid, it can point to absolutely nothing in the Prospectus or elsewhere as support for that view.

Plaintiff in its third and fourth allegations asks this Court to second guess the

substance of the PADC's decision. We will decline this invitation. As we have already discussed, APA review is deferential to agency expertise and discretion. Saratoga has given us no reason to intrude on the PADC's decision in this instance.

Saratoga highlights only three "flaws" in Delta's proposal, Saratoga Motion at 59–61, and asks the Court to find that this proves that the PADC decision was arbitrary and capricious. It is clear from the voluminous administrative record, however, that no proposal was perfect. The PADC staff's final report, in fact, stated that Saratoga's architectural design "result[ed] in disjointed and confusing space," and that Saratoga's development team generally had "limited or no experience" developing projects of this type.

This decision was a question of judgment where not every factor that was considered could be quantified. In such a setting, "we must be chary of substituting our own evaluation for that of the agency." *Braniff Airways, Inc. v. CAB*, 379 F.2d 453, 463 (D.C.Cir.1967); *see also Black Citizens for a Fair Media v. FCC*, 719 F.2d 407, 417 (D.C.Cir.1983) ("greater deference is given administrative bodies when their decisions are based upon 'judgmental or predictive' conclusions"), *cert. denied*, 467 U.S. 1255, 104 S.Ct. 3545, 82 L.Ed.2d 848. Instead, "the proper inquiry under the arbitrary and capricious standard is 'whether a reasonable person, considering the matter on the agency's table, could arrive at the judgment the agency made.'" *New York State Comm'n on Cable Television v. FCC*, 749 F.2d 804, 813 (D.C.Cir.1984) (quoting *World Communications, Inc. v. FCC*, 735 F.2d 1465, 1476 (D.C.Cir.1984)). In selecting between imperfect proposals, the PADC was well within the bounds of its discretion when it decided that, upon balancing the various flaws against one another, Delta's was superior to the competition. Courts are ill-equipped to second guess the agency's exercise of discretion.

## CONCLUSION

For the reasons stated above, plaintiff's motion for partial summary judgment is denied, and defendants' motion for summary judgment is granted. Judgment is entered for defendants and this case is dismissed.