MARINETTE MARINE, Plaintiff,

v.

UNITED STATES COAST
GUARD, Defendant.

Civil Action No. 96–1290(EGS).

United States District Court,
District of Columbia.

March 7, 1997.

Robert Alton Mangrum, Winston & Strawn, Washington, D.C., for Plaintiff.

Bruce R. Hegyi, Asst. U.S. Atty., Washington, D.C., for U.S. Coast Guard.

William C. Buckhold, Marcus Bedford Slater, Fort & Schlefer, L.L.P., Washington D.C., for Bollinger Shipyards, Inc.

## OPINION & ORDER

SULLIVAN, District Judge.

This is a disappointed bidder action challenging the award of a contract to Bollinger Shipyards, Inc., ("Bollinger")[1] by the United States Coast Guard ("Coast Guard"). The disappointed bidder, Marinette Marine Corporation ("Marinette"), seeks declaratory and injunctive relief to enjoin the Coast Guard from proceeding with the contract. Pending before the Court are the parties' cross-motions for summary judgment pursuant to Federal Rule of Civil Procedure 56(c). The Court consolidated plaintiff's request for a preliminary injunction with plaintiff's summary judgment motion. Upon consideration of the undisputed facts, relevant statute, regulations and case law, and the record herein, the defendant's motion for summary judgment is **GRANTED** and the plaintiff's motion for summary judgment is **DENIED**.

## I. FACTS

In order to replace its fleet of aging Coastal Patrol Boats ("CPB"), the Coast Guard issued a solicitation involving the design and construction of a patrol boat with options for the construction of up to 50 additional boats. The solicitation required each offeror to select an existing patrol boat or "parent craft" which it would then modify to meet the requirements of the solicitation set forth in the Circular of Requirements ("COR").

The Coast Guard received seven proposals. The proposals were given letter codes to be used in lieu of the proposer's name during the evaluation process to ensure that those responsible for evaluating the proposals were not aware of which company submitted the proposal.

The solicitation listed 13 technical evaluation factors. Each technical evaluation factor was to be evaluated and assigned a color rating as follows:

| Exceptional | Blue | Exceed requirements in a way beneficial to the Coast Guard; high probability of success; no defects or significant shortcomings. |
| Acceptable | Green | Meets or ability to meet all requirements; good probability of success; shortcomings can be readily corrected. |
| Marginal | Yellow | Fails to meet one or more requirements; marginal probability of success. |
| Unacceptable | Red | Fails to meet a requirement and needs a major revision or a major redirection of effort to make acceptable. |

Uncertainties in the ratings were reflected in the risk assessment, which was deemed either high, moderate or low. The technical evaluation was to weigh more than the total evaluated price.

The technical portion of the proposals was evaluated by the Technical Evaluation Team ("TET").[2] The TET did not have access to the price or administrative portions of the proposals. After an initial evaluation of the proposals by TET, the Coast Guard entered into written and oral discussions with each bidder. Following these discussions, the bidders submitted Best and Final Offers ("BAFO") which were evaluated by the Coast Guard. The findings of each evaluation team were presented to the Source Evaluation Board, which reviewed the findings and prepared a report to be presented to the Source Selection Official.

In his capacity as the Source Selection Official for this procurement, Vice Admiral A.E. Henn, Vice Commandant of the Coast Guard, conducted an independent appraisal of the Source Evaluation Board final report and directed award of the contract to the submitter of proposal B, which was Bollinger.

---

1. Bollinger was granted leave to intervene in this case pursuant to Federal Rule of Civil Procedure 24.

2. The other evaluation teams were Past Performance and Cost/Price.

Bollinger was awarded the CPB contract on March 19, 1996.[3]

The unsuccessful bidders filed protests with the General Accounting Office ("GAO") challenging the contract award. Due to the timely filing by Swiftships, Inc., contract performance was stayed under 48 C.F.R. § 33.104(c)(1).[4] On April 24, 1996, the Coast Guard, pursuant to 48 C.F.R. § 33.104(c)(2),[5] overrode the stay by authorizing contract performance. The GAO consolidated the protests for purposes of adjudication. Following GAO denial of the admission of all the parties' proposed experts, Marinette withdrew its protest. Marinette's protest was formally dismissed by GAO on June 3, 1996.[6]

## II. STANDARD OF REVIEW

### A. Motion for Summary Judgment

Summary judgment should be granted pursuant to Federal Rule of Civil Procedure 56 only if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In ruling on cross-motions for summary judgment, the court shall grant summary judgment only if one of the moving parties is entitled to judgment as a matter of law upon material facts that are not genuinely disputed. *Rhoads v. McFerran*, 517 F.2d 66, 67 (2d Cir.1975). The cross-motions for summary judgment pending before the Court present no genuinely disputed material facts that would preclude summary judgment.

### B. Review of Agency Action

■ In reviewing a contract award decision, the standard of review is whether the agency action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). This standard requires plaintiff to demonstrate that the agency action "had no rational basis" or "involved a clear and prejudicial violation of applicable statutes or regulations." *Kentron Hawaii, Ltd. v. Warner*, 480 F.2d 1166, 1169 (D.C.Cir.1973).

■ The scope of review is narrow and the Court is expected to exercise restraint in deciding whether to set aside agency actions. *Delta Data Sys. Corp. v. Webster*, 744 F.2d 197, 203–04 (D.C.Cir.1984); *Saratoga Dev. Corp. v. United States*, 777 F.Supp. 29, 39 (D.D.C.1991), *aff'd*, 21 F.3d 445 (D.C.Cir. 1994). If a rational basis exists for the agency's decision, the Court cannot substitute its judgment for that of the agency, *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971), merely because the Court believes the procurement decision "ill-considered," *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1299–1301 (D.C.Cir.1971). The D.C. Circuit has held that "[i]t is undisputable that the ultimate grant of a contract must be left to the discretion of a government agency; the courts will not make contracts for the parties." *National Fed'n of Fed. Employees v. Devine*, 679 F.2d 907, 915 (D.C.Cir.1981), (quoting *Scanwell Labs., Inc. v. Shaffer*, 424 F.2d 859, 869 (D.C.Cir.1970)). Courts place such great weight on the discretion typically accorded to procurement officials because "[j]udges are 'ill-equipped to

---

3. On March 25, 1996, Marinette filed a protest challenging the small business status of Bollinger. On April 22, 1996, the Small Business Administration denied the protest and certified Bollinger as a small business boat builder.

4. 48 C.F.R. § 33.104(c)(1) provides:
Protests after award. When the agency receives notice of a protest from the GAO within 10 days after contract award or within 5 days after a debriefing date offered to the protester for any debriefing that is required by 15.1004, whichever is later, the contracting officer shall immediately suspend performance or terminate the awarded contract, except as provided in paragraphs (c)(2) and (3) of this section.

5. 48 C.F.R. § 33.104(c)(2) provides:

In accordance with agency procedures, the head of the contracting activity may, on a nondelegable basis, authorize contract performance, notwithstanding the protest, upon a written finding that—(i) Contract performance will be in the best interests of the United States; or (ii) Urgent and compelling circumstances that significantly affect the interests of the United States will not permit waiting for the GAO's decision.

6. On June 12, 1996, the GAO dismissed the remaining protests on the CPB contract award.

**4**

settle the delicate questions involved in procurement decisions.'" *Elcon Enters., Inc. v. Washington Metro. Area Transit Auth.*, 977 F.2d 1472, 1479 (D.C.Cir.1992), (quoting *Kinnett Dairies, Inc. v. Farrow*, 580 F.2d 1260, 1271 (5th Cir.1978)); *see also Building & Constr. Trades Dep't, AFL–CIO v. Brock*, 838 F.2d 1258, 1266 (D.C.Cir.1988); *Delta Data Sys. Corp. v. Webster*, 744 F.2d 197, 203 (D.C.Cir.1984).

## III. DISCUSSION

In its motion for summary judgment, Marinette claims that Bollinger's Proposal did not comply with the technical requirements of the solicitation and it, therefore, was ineligible for the contract award.[7] Plaintiff argues that the Coast Guard's award of the contract to Bollinger was, therefore, arbitrary and capricious. In arguing that Bollinger's proposal failed to meet the technical requirements, plaintiff contends that Bollinger could not meet the solicitation requirements in three specific areas: speed, electrical power, and propeller cavitation. Defendant Coast Guard and Defendant–Intervenor Bollinger respond that the Bollinger proposal satisfied the technical requirements and that the Coast Guard's decision to award the contract to Bollinger was rational.

## A. Speed

Plaintiff contends that Bollinger's proposal failed to satisfy the speed requirement of the solicitation. The solicitation required that the designed vessel be capable of a continuous speed of at least 25 nautical miles per hour in calm water at full load conditions at the end of the vessel's service life. All bidders were required to submit data supporting their claims that their boat would meet the speed requirement. While the Coast Guard rejected Bollinger's first proposal, finding that its speed predictions were not supported by the data submitted, the Coast Guard accepted the speed predictions in Bollinger's BAFO.

Plaintiff challenges the Coast Guard's acceptance of the Bollinger's speed predictions arguing that the sea trial data and calculations were flawed, and that an inaccurate boat weight was used when the speed was calculated.

### 1. Sea trial data and calculations

■ In arguing that the speed requirement cannot be met, plaintiff challenges the sea trial data and speed calculations submitted in support of Bollinger's BAFO. With regard to the data, plaintiff essentially argues that because the Parent Craft was used in the sea trials, the data cannot be used to accurately predict the speed of Bollinger's proposed boat. With regard to the calculations, plaintiff argues that they contain fundamental errors and that defendant failed to conduct its own analysis.

In response, defendant, through its expert, Lt. Commander Barrett, contends that the Coast Guard reviewed and analyzed the data and calculations prior to acceptance of them. Barrett further notes that the data, which was submitted by reputable companies, was consistent industry information. Barrett also offers industry literature which validates the use of parent craft sea trial data in predicting speed of a proposed vessel.

In light of the fact that 1) use of Parent Craft Sea Trial data, as recognized by all parties, is an acceptable method for calculating the speed of proposed boats, *see* Gillmer, Thomas C. Modern Ship Design (U.S. Naval Instit. Press, 2d ed.1975), and 2) that the calculations *prior to being accepted* were reviewed by Barrett and members of the TET, who have the knowledge, training and experience to properly analyze the calculations, the

---

7. In its complaint, Marinette makes four specific claims: (1) that Bollinger's proposal does not comply with the technical requirements; (2) that the cost-technical tradeoff analysis was omitted; (3) that Marinette's proposal was improperly evaluated; and (4) that the proposals were not treated on an equal basis. In its motion for summary judgment, however, plaintiff "has narrowed the issues to those that comprise the core of its complaint against the award to Bollinger" and addresses only the first claim—that Bollinger's proposal does not comply with the technical requirements of the solicitation. Pl. Mem. of Points and Auth. at 2. The Court interprets this "narrowing of the issues" as an abandonment of plaintiff's other claims and will address only the claims raised in plaintiff's motion for summary judgment.

Court cannot conclude that the defendant's acceptance of the data and calculations was arbitrary and capricious. *See Building and Constr. Trades Dept., AFL–CIO v. Brock,* 838 F.2d 1258, 1266 (D.C.Cir.1988) ("When called upon to review technical determinations on matters to which the agency lays claim to special expertise, the courts are at their most deferential.").

Plaintiff's main concern appears to be defendant's acceptance of the sea trial data and calculations submitted in support of Bollinger's BAFO without conducting a second model test. Plaintiff argues that it was arbitrary and capricious for defendant to accept the data and calculations where Bollinger's initial speed proposals were shown to be deficient.

However, the record reflects that the information submitted by Bollinger in support of its BAFO was not accepted without reservation and that the shortcomings in the speed prediction data were taken into account in rating Bollinger's proposal. In its final report, the TET found that the speed-power prediction for Bollinger's proposal was based on "widely ranging" sea trials and not supported by model test data, but that other deficiencies and weaknesses had been addressed in the BAFO. The Source Selection Official concluded that the speed-power factor was "technically acceptable but with a high risk," and as a result upgraded Bollinger's proposal from a Red (unacceptable) rating to a Yellow (marginal, but acceptable) rating. The risk assessment was rated as high to reflect any uncertainties. The defen-

dant's actions with regard to the sea trial data and calculations were rational.

## 2. Weight Used When Speed Calculated

■ In challenging the speed conclusions, plaintiff also claims that the defendant failed to calculate the speed using the "likely" or "actual anticipated" weight of the proposed boat. Plaintiff claims that Bollinger's boat was recognized by the Coast Guard to be 3.5 to 6.5 metric tons overweight, but defendant nevertheless calculated the boat speed using the target weight of 91.19 metric tons. Plaintiff concludes that the defendant's use of the target weight, as opposed to the then-actual weight, in calculating the speed of the boat, was irrational and arbitrary and capricious.

Defendant argues that calculating the speed with the target weight was appropriate and rational because of the Coast Guard's experts' knowledge that a reduction of 3.5 metric tons was manageable.[8]

Plaintiff insists that the Coast Guard did not believe that target weight could be attained, citing the technical evaluation report for technical factor # 5–Draft and Weight. Plaintiff is, however, reading far more into the evaluation report than warranted. While the report indicates that based on the information provided by the offeror the proposed boat will weigh 3.5 metric tons more that the proposal's estimate, it does not state, as plaintiff contends, that the defendant did not believe the target weight could be attained.[9]

8. In his Second Supplemental Declaration, Barrett indicates that the current boat design is only 1.5 metric tons over the target weight. Plaintiff argues, and the Court agrees, that this fact has little bearing on whether, at the time the contract was awarded to Bollinger, the defendant abused its discretion by failing to calculate the speed using the assumed weight of the proposed boat.

9. The relevant portions of the report provide:

Narrative:
Technical:
*The offeror has failed to adequately support the 6.5 MT reduction in structural weight (SWBS 100) between the Parent Craft and the CPB. The CPB weight report also fails to account for the small brackets and supports (Parent Craft SWBS 199) which is documented as 2.4 MT in the Parent Craft. However,*

*TET predicts CPB will still meet the 1.83 M draft requirement (1.81m Full Load, EOSL) after accounting for the unsupported weight differences between the Parent Craft*
Risk:
*Offeror's explanation of the differences in structural weights presented in the BAFO describes many changes which occurred in various SWBS group (e.g. shafting, deck crane). Many of these changes were already apparent in other areas of the weight report. The weight reduction report is unresponsive to the discussions held between the offeror and the Coast Guard. Therefore, the risk is elevated due to the unresolved weight differences between the Parent Craft and the CPB.*
Shortcomings:
The Welding Material, Small Brackets & Supports line item in the Parent Craft (group 199) weight estimate (2.4 MT) does not ap-

Indeed, it appears to the Court that such a conclusion in the early design phase technical evaluation report would be unreasonable where subsequent designs and actual construction would have an impact on the weight of the boat. The Court notes that the purpose of the report cited by plaintiff was to rate the Draft and weight technical factor. The purpose of the report does not appear to be to conclusively predict the weight of the actual boat. In accord with the purpose of the report, the TET assigned a Yellow/High Risk to that factor based on the unresolved weight issues. In accord with the purpose of the report, the TET assigned a Yellow rating and a High risk assessment to Draft and Weight factor based on reasons articulated in the narrative section.

In view of the foregoing, the Court holds that the use of the target weight in calculating the speed of Bollinger's boat was not irrational, or arbitrary and capricious.

## B. Electrical Power

■ Plaintiff also claims that Bollinger failed to meet the technical requirements because Bollinger used a load factor of 0.4 in its electrical system. Plaintiff contends that the solicitation required a load factor of 0.9. The government claims that the load factor of 0.9 was not a requirement, but merely guidance.

Section 300 of the COR sets forth the requirements of the electrical system to be designed by the offerors. Subsection 300–2.1 provides as follows:

The complete electrical plant and its equipment shall be in accordance with the requirements of IEEE–STD–45, Recommended Practice for Electrical Installation on Shipboard, and Title 46, Code of Federal Regulations (46 CFR), Subchapter J, Electrical Engineering, unless otherwise specified in the COR.

Subsection 300–2.1.1 provides as follows:

The recommendations given in the referenced standards shall be interpreted as

requirements. Throughout the text of each document, the word "shall" shall be substituted for the words "may" or "should" and the word "required" shall be substituted for the word "recommend".

Subsection 300–2.4 provides as follows:

The contractor shall prepare a preliminary system load and power analysis in accordance with the guidance provided in DDS 310–1. This analysis shall be prepared to a level of detail required to facilitate estimating space and weight requirements for the major components of the electric plant.

Plaintiff argues that subsection 300–2.4, read in conjunction with subsection 300–2.1.1, requires the offeror to design a system in accordance with DDS 310–1, which specifies a load factor of .09. Defendant and intervenor respond that subsection 300–2.1.1 applies only to subsection 300–2.1. Therefore, defendant concludes, subsection 300–2.4 should be read as written, i.e., that "the contractor shall prepare a preliminary system load and power analysis in accordance with the *guidance* provided in DDS 310–1." COR § 300–2.4 (emphasis added).

Defendant acknowledges that the initial evaluation indicated that the electrical system was required to have a load factor of 0.9, as set forth in DDS 310–1. Defendant claims, however, that this was an error due to the misreading of the solicitation requirements.

While the electrical system requirements set forth in the COR is far from a model of clarity, the issue for this Court to resolve is whether the Coast Guard's interpretation of its own solicitation is irrational, or arbitrary and capricious. The Defendant's claim that subsection 300–2.1.1 applies only to the preceding subsection 300–2.1 is entirely reasonable based on the numbering of the subsection. Subsection 300–2.1.1 is clearly a subsection of 300–2.1, just as subsection 300–2 is a subsection of section 300. It is also reasonable for the

pear to be included in the CPB Weight Estimate.

The offeror does not adequately support the *6.5 MT* reduction in hull structure weight (SWBS 100) between the Parent Craft and

the CPB. TET estimates weight reduction should be approximately 3 MT, *and the CPB weight will be 3.5 MT higher than the proposal's estimate.*

(underlining in original)

Coast Guard to interpret 300–2.4 as requiring that a preliminary load and power analysis be prepared by the offeror, and that the specifications set forth in DDS 310–1 be used as *guidance* in preparation of the analysis. Thus, the Court cannot say that the defendant's interpretation of its technical requirements is irrational.

## C. Propeller Cavitation

Plaintiff also claims that the propeller proposed by Bollinger does not meet the "10% back-cavitation" requirement and that the Coast Guard's acceptance of Bollinger's proposed propeller change was unreasonable and irrational. In its BAFO, Bollinger proposed a new propeller—a 5–blade propeller, as opposed to a 3–blade propeller used on other Bollinger boats. Plaintiff's expert claims that this propeller does not meet a "10% back-cavitation" requirement. The Coast Guard's expert claims that he and the TET reviewed the information provided by Bollinger and information provided by the Bird–Johnson Company, the company which designed and would manufacture the propeller, and concluded that the propeller would meet the cavitation requirement.

Plaintiff argues that based on its expert's calculations, the proposed propeller will not meet the back-cavitation requirement. Plaintiff is asking the Court to accept its expert's opinion over defendant's expert's opinion. However, it is not the role of the Court to determine if the proposed propeller will actually meet the solicitation cavitation requirement. Rather, the Court must determine if defendant's decision to accept Bollinger's conclusion that the propeller would meet the cavitation requirement had a rational basis. The record contains documentation on the proposed 5–blade propeller provided by Bollinger and Bird Johnson. The Court notes that Bird–Johnson specifically provides in its Propeller Optimization Program that the propeller satisfies the 10% back cavitation requirement. Thus, the Court cannot conclude that defendant's acceptance of the propeller, where information was provided and reviewed by defendant, was without a rational basis.

## IV. CONCLUSION

Defendant's motion for summary judgment is **GRANTED**. Plaintiff's motion for summary judgment is **DENIED**.